A.J. CANFIELD CO., a corporation,
Plaintiff-Appellee,

v.

VESS BEVERAGES, INC., a corpora-
tion, Defendant-Appellant.

No. 85–2215.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 1985.

Decided July 15, 1986.

David C. Hilliard, Pattishall, McAuliffe & Hofstetter, Chicago, Ill., for defendant-appellant.

Richard H. Compere, Willian, Brinks, Olds, Hoffer, Gilson & Lione, Ltd., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

CUMMINGS, Chief Judge.

This case involves a dispute over the plaintiff's ability to trademark the term CHOCOLATE FUDGE on a soft drink can. Defendant appeals the granting of a preliminary injunction that enjoins it from using CHOCOLATE FUDGE on its can of diet soda. For the reasons set out below, we affirm.

The plaintiff, A.J. Canfield Co., is an Illinois corporation that has bottled and sold a variety of soft drinks in the midwest since 1924. In 1972 Canfield developed a diet chocolate soda and labeled it under the alleged trademark CHOCOLATE FUDGE. Although other soft drink companies had diet chocolate-flavored soda, they labeled it CHOCOLATE. Over the 13-year period from 1972 to 1985 Canfield sold an average of 1.25 million cans a year. In August of 1984 Canfield switched artificial sweeteners from saccharin to nutrasweet in its line of diet soft drinks, including chocolate fudge. It spent approximately $500,000 promoting this change. The design of the can has "Canfield" prominently displayed as its housemark [1] as well as CHOCOLATE FUDGE in large block letters. Until 1984 the can also contained, in smaller letters, "artificially sweetened chocolate soda."

In January of 1985, Canfield received every company's dream, free advertising. Bob Greene, a widely read syndicated columnist for the *Chicago Tribune*, wrote an article about Canfield's Diet Chocolate

---

1. The housemark is "Canfield" in script topped by a crown and all surrounded with a large "C."

Fudge Soda. The column raved about the soda pop. Greene, an admitted chocoholic, compared the drink to a cold hot fudge sundae, claimed that "chocolate" was inadequate to describe its flavor, and told his readers it had done wonders for his diet. Public reaction was swift; the demand became such that Canfield had a difficult time keeping its diet chocolate fudge soda on market shelves. Helping with the dramatic increase in sales was the rest of the media. Canfield's diet chocolate fudge soda received coverage from newspapers and magazines (including *The New York Times* and *Time*) and also television coverage. Canfield, after numerous requests, licensed 12 bottlers nationwide to distribute its diet chocolate fudge soda across the country. Letters and phone calls to Canfield requested the drink or information where it could be purchased. Sales have increased 100-fold to approximately 50 million cans per annum.

The defendant, Vess Beverages, has bottled and sold soft drinks in the midwest since 1924. From 1979 until 1981 Vess produced a chocolate-flavored drink, labeled CHOCOLATE. The flavor was discontinued because of poor sales. After Greene's article in January 1985, Vess reentered the market with a new formula (different ingredients and taste) and labeled it CHOCOLATE FUDGE. On April 4, 1985, Vess received a cease and desist letter from Canfield asserting trademark rights in the term CHOCOLATE FUDGE. Nevertheless Vess went on to produce cans and market the new drink using the designation CHOCOLATE FUDGE. On April 30, 1985, Vess issued a press release and advertisement announcing "Diet Chocolate Fudge Now Available From Vess." Vess had no trouble getting shelf space for its product; in fact retailers called Vess seeking the new soda. This suit soon followed.

Canfield brought this unfair competition action against Vess on May 2, 1985, under Section 43(a) of the Lanham Act and Illi-

nois common law. Canfield, asserting trademark rights in the designation CHOCOLATE FUDGE for diet soda, claims Vess' usage is unfair competition. On July 12, 1985, the district court granted Canfield's motion for a preliminary injunction, which prohibited Vess from using CHOCOLATE FUDGE to market its soft drink, 612 F.Supp. 1081, required Vess to deliver up and destroy its current inventory labeled chocolate fudge, and required Canfield to post a surety bond of $60,000.[2]

Vess brings this interlocutory appeal under 28 U.S.C. § 1292(a) and raises the following issues: Vess argues that the district court abused its discretion in granting the injunction because (1) Canfield was not likely to prevail on the merits since (a) chocolate fudge is a common descriptive term and not protectable under trademark law or (b) it is merely descriptive without secondary meaning; (2) the balance of harms weighs in favor of Vess; (3) the public interest will be disserved due to lack of competition in diet chocolate fudge sodas; and (4) even if CHOCOLATE FUDGE is a protectable trademark, Vess has adopted a fair use of the term to describe the taste of its soda. Vess also argues that the $60,000 bond required of Canfield is inadequate. We affirm.

## I. STANDARD OF REVIEW

Appellate review of preliminary injunction grants has been recently explained by this Court, see *Lawson Products Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436–1438 (7th Cir.1986); *American Hosp. Supply v. Hospital Products Ltd.*, 780 F.2d 589 (7th Cir. 1986). The standard of review is extremely deferential, typically stated as abuse of discretion. *Roland Machinery Corp. v. Dresser Indus., Inc.*, 749 F.2d 380, 384–385, 388–391 (7th Cir.1984). As was discussed in *Lawson*, the review of a grant of preliminary injunction is mixed. Factual determinations are reviewed under a clearly erroneous standard; legal conclusions are reviewed de novo. 782 F.2d at 1437.

**2.** On September 11, 1985, the district court amended the preliminary injunction order allowing Vess to sell its inventory of filled cans by striking the term "fudge" and replacing it with

"soda." Under this order Vess may continue to market its diet chocolate soda as long as it does not use the term CHOCOLATE FUDGE.

But the ultimate weighing and balancing that makes up the decision whether to issue a preliminary injunction is highly discretionary given substantial deference. *Id.* Thus our review is limited to determining "whether the judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes." 749 F.2d at 390.

The district court must evaluate the case under a well-delineated four-part test; we will review that court's analysis under that test for factual and legal error. See *Roland,* 749 F.2d at 388–391; *Lawson,* 782 F.2d at 1437; *Brunswick Corp. v. Jones,* 784 F.2d 271, 274 n. 2 (7th Cir.1986). Before granting a preliminary injunction the district court must have evidence before it through which the plaintiff has demonstrated the following: (1) no adequate remedy at law and irreparable harm; (2) "some" likelihood of success on the merits; (3) the balance of relative harms weighs in its favor; and (4) the public interest will not be disserved if the injunction issues. *Roland,* 749 F.2d at 386–388.

## II. LIKELIHOOD OF SUCCESS

In order to prevail on the merits in an action under Section 43(a) of the Lanham Act, a plaintiff must show a valid trademark and a likelihood of confusion on the part of the public.[3] The district court found that Canfield had demonstrated a "substantial" likelihood of success as to both issues. Although Canfield may not have a substantial chance of prevailing at trial, see *Yoo Hoo Beverage Corp. v. A.J. Canfield Co.,* No. 85–3701 HLS (D.N.J. March 19, 1986) [available on WESTLAW, DCTU database] (district court denied Canfield's petition for preliminary injunction); *A.J. Canfield Co. v. Concord Beverage Co.,* 629 F.Supp. 200 (E.D.Pa.1985) (same), we cannot say its chances are less than negligible, and therefore affirm.

### A. Generic or Common Descriptive Term

■ According to Vess, the term CHOCOLATE FUDGE is not trademarkable be-

cause it simply describes a flavor and is thus a common descriptive term. A generic or common descriptive term is defined as one commonly used as the name or description of a kind of goods. *Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 79 (7th Cir.1977), certiorari denied, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772; *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 10 (2d Cir.1976) ("term that refers to the genus of which the particular product is a species"). A term that is generic for one particular product may be arbitrary for another; for example Ivory soap versus products made with tusks. *Abercrombie,* 537 F.2d at 9 & n. 6; *In re Seats,* 757 F.2d 274 (Fed.Cir. 1985).

Vess' primary argument is that chocolate fudge is a flavor of soda (like cherry or orange soda), which makes the term a common descriptive one. The district court disagreed, finding that chocolate fudge was not a flavor term. We disagree with the district court, but that does not mean agreement with Vess' conclusion that a flavor term must be a common descriptive term. See *In re Andes Candies,* 478 F.2d 1264 (C.C.P.A.1973) (unusual flavor name for candy industry not generic). The district court was not incorrect in deciding that chocolate fudge is a unique enough designation with respect to sodas so that it is not a common descriptive term. See *In re Andes Candies,* 478 F.2d 1264; *Borden, Inc. v. Topps Gum, Inc.,* 173 U.S.P.Q. 447 (T.T.A.B.1972) (ice cream gum not generic term); *Schmidt v. Quigg,* 609 F.Supp. 227 (E.D.Mich.1985) (Honey Baked Ham not generic term). However, the fact that chocolate fudge is merely descriptive of flavor does make it less likely that Canfield will be able to show secondary meaning.

### B. Merely Descriptive with Secondary Meaning

■ A term is merely descriptive if it specifically describes a characteristic or an

---

**3.** Vess does not argue that the district court erred in concluding that Canfield could demonstrate a likelihood of confusion between the two

sodas. Therefore, we address only whether Canfield has a chance of succeeding on the issue of a valid trademark.

ingredient of a product. *Miller,* 561 F.2d at 79. By acquiring secondary meaning such a term can become a valid trademark. 15 U.S.C. § 1052(f); *Miller,* 561 F.2d at 79; *Abercrombie,* 537 F.2d at 10. A term acquires secondary meaning when the consumer associates it with the producer rather than the product. *Wesley-Jessen Div. of Shering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862 (7th Cir.1983); *Harlequin Enterprises, Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 949 (2d Cir.1981). The focus is the attitude of the consuming public toward the designation. *Walt-West Enterprises, Inc. v. Gannett Co.,* 695 F.2d 1050, 1057 (7th Cir.1982) (primary significance of the term in the minds of the public is not the product but the producer).

Vess contends that it is unlikely that Canfield will succeed in showing secondary meaning, especially nationwide secondary meaning. First, Vess points out that the Patent Office has rejected Canfield's application for trademark protection of CHOCOLATE FUDGE. Second, Canfield markets the term CHOCOLATE FUDGE along with its housemark, see *supra* note 1, citing *Phillip Morris, Inc. v. R.J. Reynolds Tobacco Co.,* 188 U.S.P.Q. 289 (S.D.N.Y. 1975). Third, Vess argues that there is insufficient evidence to show nationwide secondary meaning.

■ Sufficient evidence was introduced at the preliminary injunction hearing to conclude that Canfield has a better than negligible chance of demonstrating secondary meaning. Although the Patent Office's rejection of Canfield's term is persuasive, it does not end the inquiry. See *Keebler Co. v. Rovira Biscuit Co.,* 624 F.2d 366, 372–373 (1st Cir.1980); *Vuitton Et Fils S.A. v. J. Young Enters., Inc.,* 644 F.2d 769, 776 (9th Cir.1981). For 13 years Canfield was the only soft drink company using the label CHOCOLATE FUDGE on a chocolate-flavored soft drink. The fact that only after Canfield's success in early 1985 did companies, which has previously sold diet chocolate soda, begin using the term CHOCOLATE FUDGE to designate the drink is evidence of a secondary mean-

ing. See *Harlequin,* 644 F.2d at 949. Canfield has spent substantial amounts in advertising and promotion of its diet chocolate fudge soda. *Telemed Corp. v. Tel-Med, Inc.,* 588 F.2d 213, 216–217 (7th Cir. 1978) (quoting 3 R. CALLMAN, UNFAIR COMPETITION AND TRADE-MARKS § 82.1 (2d ed.).

■ Additionally, Canfield's diet chocolate fudge soda has received nationwide publicity, first with Greene's article, which is syndicated in 80 newspapers across the country, then followed by newspapers and magazines of nationwide circulation (*The New York Times, Time,* and *People*). This was followed by dramatic increases in sales for Canfield. Canfield has also received numerous letters and phone calls, all searching for the elusive diet chocolate fudge drink. This evidence is sufficient to show that when consumers think of diet chocolate fudge soda they think of Canfield. *Harlequin,* 644 F.2d at 949; *Wesley-Jessen,* 698 F.2d at 866. This also supports the scope of injunction despite Canfield's initial limited midwest market. See *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037 (2d Cir.1980); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225 (3d Cir.1978). The media attention has been nationwide, the demand has been nationwide. Indeed, in those areas outside Canfield's usual market Canfield and diet chocolate fudge soda are more likely to be synonymous terms because they would have heard of neither before the media blitz.

■ Vess protests the district court's rejection of a survey it performed and also complains that Canfield did not introduce its own survey though it had a month to do so. The district court properly criticized Vess' hastily put together survey. The survey simply failed to demonstrate whether or not the public associates chocolate fudge with Canfield. As the district court pointed out, the people were polled over a short time span and in Chicago, the heart of Canfield's market. The survey was unreliable because it gave the pollees both the source name and trademark term on the same can, thus lessening the associa-

tive response since it would seem redundant. See *Wesley-Jessen*, 698 F.2d at 865–866. Although Canfield did not introduce its own survey, it was not required to do so in order to prevail on a preliminary injunction motion.

### C. Fair Use

■ Vess also contends as a defense that its use of the trademark term is a fair use under 15 U.S.C. § 1115(b)(4). The Act provides this defense against valid trademarks when the term is not being used as a trademark by the party charged with infringement and is used in good faith to describe the product to its consumers. *Abercrombie*, 587 F.2d at 12; *M.B.H. Enterprises, Inc. v. WOKY, Inc.*, 633 F.2d 50 (7th Cir.1980). Because Vess' use is exactly the type of use Canfield is attempting to protect via the trademark, this Court can presently only conclude that it must be a clear infringement of Canfield's rights. In all the cases cited by Vess the alleged infringer was using the trademark term in at least a slightly different manner. *M.B.H. Enterprises, Inc. v. WOKY, Inc.*, 633 F.2d 50 (7th Cir.1980) (service mark "I LOVE YOU" for entertainment services v. advertising campaign "I LOVE YOU MILWAUKEE, WOKY"); *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir.1979) (size designations), certiorari denied, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116; *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976) ("SAFARI" trademarks on boots v. clothing and hats). Vess is really attempting the same argument addressed in Part I.A *supra*, that CHOCOLATE FUDGE is unprotectable as a common descriptive term so that Vess may use the term as it sees fit. Assuming a valid trademark, if this isn't infringement, what is?

### III. BALANCE OF HARMS

■ The next argument Vess advances is that the district court erred in concluding that the balance of harms weighed in favor of Canfield. Vess does not explicitly appeal the district court's determination that Canfield will suffer irreparable harm and has no adequate remedy at law; rather it just claims that the district court erred in weighing and balancing the competing interests. However, in its argument Vess does contend that (a) damages will adequately compensate Canfield and (b) its reputation is safe with Vess, so we will treat these as issues raised. Even when irreparable harm to a plaintiff is shown, the harm to the defendant must be weighed. *Roland*, 749 F.2d at 387; *American Hospital*, 780 F.2d at 593–594. This requires a comparison of the harm to Canfield from the wrongful denial of a preliminary injunction with any harm that Vess may suffer that would not be cured by prevailing on the merits and Federal Rule of Civil Procedure 65(c)'s injunction bond. As was emphasized in *Lawson*, this aspect of the preliminary injunction standard is highly discretionary and can only be upset if the judge has abused his or her discretion. 782 F.2d at 1437.

Vess argues that Canfield's harm is speculative and that its reputation is in "good hands." According to Vess, if the denial is ultimately wrong, an accounting of profits and award of damages would compensate Canfield for use of its mark. Vess then argues that it will lose substantial profits from exclusion from the market. It also claims that its goodwill and reputation will suffer from its inability to fill orders and shelf space. This, Vess argues, outweighs the harm suffered by Canfield if the injunction does not issue.

The district court found that the continued use of the trademark CHOCOLATE FUDGE would tend to destroy its value as a designation source. If Vess were to continue using the mark, Canfield would lose control over the quality of the product and thus its reputation would be at risk. For these reasons the district court concluded that Canfield met the first part of the test. See *Wesley-Jessen*, 698 F.2d at 867; *Processed Plastics Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982). In balancing the relative harms, the district court noted that Vess is free to

market its soft drink as "chocolate" and that the damages bond would adequately compensate Vess for any loss in sales from marketing the drink as chocolate instead of chocolate fudge. Further, Vess has 28 other flavors of soda; last year it made approximately $21,000,000 from sales of those sodas. Any loss associated with its temporary inability to use chocolate fudge to describe its diet chocolate soda will not affect the continued success of the company. See *Roland*, 749 F.2d at 391.

Additionally, the district court considered the relative hardships. *Wesley-Jessen*, 698 F.2d at 867; *Helene Curtis Indus. v. Church & Dwight Co.*, 560 F.2d 1325, 1333–1334 (7th Cir.1977). The court compared Canfield's 13 years of marketing, nationwide promotional efforts, and distributorship arrangements with Vess' minimal investment and promotional activities as well as Canfield's early notice that it asserted rights in CHOCOLATE FUDGE. In that way it concluded that Canfield had a greater stake in the controversy.

We find no error in either the findings of the district court or the balancing process. Because the judge determined that the plaintiff has a substantial likelihood—and we agree that its chances are at least better than negligible—and that the plaintiff's possibility of harm is greater than that of defendant's, it was not an abuse of discretion in deciding to grant the injunction.

## IV. PUBLIC INTEREST

■■■ Vess contends that the district court failed to consider the public interest in competition for the product diet chocolate fudge soda. When the impact of a preliminary injunction has wide-ranging effects a district court must consider whether the public interest will be disserved by the grant of a preliminary injunction. *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976). The defendant cites *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 117, 59 S.Ct. 109, 113, 83 L.Ed. 73. But *Kellogg* is easily

distinguishable because there the product was unprotected by a valid trademark. Here Canfield has demonstrated that there is a better than negligible chance that the term CHOCOLATE FUDGE is protectable. Thus the relevant consideration is the consumers' interest in not being deceived about the products they purchase. The district court noted that there is a likelihood of confusion among the public with respect to whether or not they are receiving the product described in Greene's article and subsequent media coverage. The district court thus adequately assessed the public interest and concluded that it would not be disserved.

## V. INADEQUATE BOND

Federal Rule of Civil Procedure 65(c) requires a bond for payment of costs and damages of any party wrongfully enjoined. *Coyne-Delany Co. v. Capital Development Bd.*, 717 F.2d 385 (7th Cir.1983), limits recovery to the amount of the bond. In this case, the district court required Canfield to put up a $60,000 bond. Vess claims the bond is inadequate.

■■■ According to Vess it has a normal inventory of $53,000 (filled chocolate fudge soda cans) whereas the bond only covers $60,000.[4] But now that Vess is free to sell the inventory under the September 11, 1985, modification order (by altering the cans to read chocolate soda instead of chocolate fudge) the $60,000 should be more than adequate. See *supra* note 2.

Vess also complains that the court failed to protect Vess against loss of profits from its inability to continue to sell its diet chocolate fudge soda line. Vess estimates its minimum expected profits to be $625,000. Again, the district court's September 11, 1985, order (see *supra* note 2) renders most of this complaint somewhat moot because Vess will be able to enter the diet chocolate soda market and profit from sales of its soda. To the extent that Vess argues it

---

**4.** In its brief Vess claims that the preliminary injunction order allows only $20,000 of the $60,000 bond to cover its inventory loss. We cannot discern from the order such a division of the bond proceeds and so assume that the $60,000 is meant to cover all related costs.

would have made more money if allowed to use the term CHOCOLATE FUDGE, the difference in profits should be adequately protected by the $60,000. The district court did not abuse its discretion.

For these reasons we affirm the preliminary injunction order of the district court prohibiting Vess from using the term CHOCOLATE FUDGE on its diet chocolate soda cans.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

I agree that there is an adequate, but hardly ample, basis for affirming the preliminary injunction in all respects except its nationwide scope. I do not believe, however, that there is a credible basis for showing nationwide secondary meaning. Bob Greene's article led to some publicity for diet chocolate fudge soda outside Chicago. In addition substantial sales have been made by Canfield's licensed bottlers in other parts of the country. But, until as late as January, 1985, Canfield sold its diet fudge soda only in the Midwest. The majority speculates that "in those areas outside Canfield's usual market Canfield and diet chocolate fudge soda are more likely to be synonymous terms because they would have heard of neither before the media blitz." But there is absolutely no survey evidence to even suggest the possibility of nationwide secondary meaning. I would require more than has been shown here to support a nationwide injunction—even of a preliminary nature. *See A.J. Canfield Co. v. Concord Beverage Co.*, 629 F.Supp. 200, 209–212 (E.D.Pa.1985).

I therefore respectfully dissent as to the scope of relief.