**DRANOFF–PERLSTEIN ASSOCIATES,**
Appellant,

v.

**Harris J. SKLAR.**

No. 91–1415.

United States Court of Appeals,
Third Circuit.

Argued Jan. 28, 1992.

Decided June 17, 1992.

Stuart E. Beck (argued), Riley & DeFalice, Philadelphia, Pa., for appellant.

No appearance for appellee.

Before: STAPLETON, SCIRICA and ALITO, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this trademark infringement action, plaintiff Dranoff–Perlstein Associates appeals the district court's order granting summary judgment for defendant Harris J. Sklar. We agree with the district court that a portion of plaintiff's mark is generic and unprotectible. However, because we are unable to determine on the present record whether there is a likelihood of confusion between the parties' marks as a whole, we will reverse and remand for further proceedings.

## I.

Dranoff–Perlstein Associates and Harris J. Sklar both practice personal injury law in the Delaware Valley. In 1984, Dranoff–Perlstein began using "INJURY–1" as its telephone number, and embarked on an advertising campaign designed to capitalize on that mnemonic.[1] The campaign included, among other things, sixty-second radio advertisements on several popular local radio stations;[2] advertisements in the "yel-

---

1. In *Bates v. State Bar,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Supreme Court held that blanket bans on lawyer advertising violate the First Amendment.

2. In 1984, Levinson Advertising Inc. put together the following sixty-second radio spot for Dranoff–Perlstein:

When you are hurt in an accident you need a lawyer to protect your rights. You need to dial INJURY–1. That's I–N–J–U–R–Y 1. Automobile Accident? Dial INJURY–1.

Medical Malpractice? Dial INJURY–1. Death Claims? Dial INJURY–1.

When you dial INJURY–1, you'll talk to Dranoff–Perlstein Associates. Lawyers that really can help. We'll give you straight answers to your questions. And best of all we'll work on a contingent fee basis, so you pay nothing unless you collect. Bus and Trolley accidents? Dial INJURY–1. Negligence and Defective Products? Dial INJURY–1. Slip and Falls? Dial INJURY–1.

Injured? Dial I–N–J–U–R–Y 1—Call twenty-four hours a day to arrange for your free

low pages" of the telephone book;[3] and postage meter tapes with a telephone and the number "I–N–J–U–R–Y–1" prominently featured.

In 1990, Sklar obtained the telephone number "INJURY–9," and began an advertising campaign designed to capitalize on his mnemonic. Sklar's campaign included radio spots,[4] advertisements in the yellow pages, newsletters, and handbills, all of which prominently featured the INJURY–9 mnemonic.

On May 4, 1990, Sklar applied for registration of "INJURY–9" as a service mark on the principal register at the United States Patent and Trademark Office. On May 29, 1990, Dranoff–Perlstein applied for registration of "INJURY–1" as a service mark.

On July 31, 1990, Dranoff–Perlstein filed this action in the United States District Court for the Eastern District of Pennsylvania. In its Amended Complaint, Dranoff–Perlstein alleged that Sklar's use of "INJURY–9" constituted unfair competition and trademark infringement under the common law and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), which governs unregistered trademarks. The Amended Complaint also included a pendent state law claim for trademark dilution under 54 Pa.Cons.Stat.Ann. § 1124.

On November 21, 1990, Dranoff–Perlstein asked the Patent and Trademark Office to suspend prosecution of Sklar's application for registration during the pendency of this case. That request was granted on November 28, 1990.

On cross-motions for summary judgment, the district court granted Sklar's motion, and dismissed the case with prejudice. The court held, in the alternative: (1) that the marks in question were "functional and generic," and thus not entitled to trademark protection; or (2) if the marks were descriptive, that no showing of "secondary meaning" had been or could be made that would justify trademark protection.

## II.

### A.

The district court had original jurisdiction under 28 U.S.C. § 1338. We have appellate jurisdiction under 28 U.S.C. § 1291.

In our plenary review of the district court's grant of summary judgment, we apply " 'the same test the district court should have utilized initially.' " *Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084, 1093 (3d Cir.1988) (quoting *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977)). Therefore, we must determine

---

consultation. Start on the road to compensation today by dialing INJURY–1 for all types of personal injury claims.
The record contains similar radio spots from the years 1987–89.

**3.** One such advertisement read, in part:
INJURED?
DIAL I–N–J–U–R–Y–1
FOR ALL ACCIDENT CASES & PERSONAL INJURY CLAIMS

. . . . .

DRANOFF–PERLSTEIN ASSOCIATES
admitted to Federal and State Bars of Pennsylvania & New Jersey
Trial Law in All Courts.
1604 Spruce Street
Philadelphia, PA 19103
Call 24 Hours
I–N–J–U–R–Y–1
(465–8791) or 732–8530

**4.** In 1990, Sklar ran the following sixty-second radio spot on WWDB–FM:

Does anybody know what the term "Products Liability" means? Hundreds of people each year suffer injuries and even death from defective products. Manufacturers must learn to make their products consumer safe or be responsible for the problems or damages they cause. If you have suffered injury as a result of a defective product, whether it be from a flaw in design, faulty manufacturing or inadequate labeling call the law firm of Harris Sklar at I–N–J–U–R–Y–9. Harris is an attorney who will discuss your situation FREE of CHARGE and determine if you have a Products Liability claim. You may be entitled to a recovery. Harris has been helping injured victims for over 25 years and has the knowledge and background to help you get the compensation you deserve. Harris really cares. Call him at I–N–J–U–R–Y–9. If Harris represents you, his fee will come from the money he recovers on your behalf. Dial I–N–J–U–R–Y–9. You have legal rights and Harris can help you protect them.

whether the evidence, taken in the light most favorable to Sklar, demonstrates that there are no genuine issues of material fact and that Dranoff–Perlstein is entitled to judgment as a matter of law. *Id.*

### B.

Section 43(a) of the Lanham Act "extends protection to unregistered trademarks on the principle that unlicensed use of a designation serving the function of a registered mark constitutes a false designation of origin and a false description or representation." *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986). However, a designation is only protectible "if the public recognizes it as identifying the claimant's 'goods or services and distinguishing them from those of others.'" *Id.* (quoting 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 15:1, at 657 (2d ed. 1984)).

Under the Lanham Act, service marks, which are used to identify the source of services, are entitled to the same legal protection as trademarks, which are used to identify the source of goods. 1 Jerome Gilson, *Trademark Protection and Practice* § 1.02[1][b], at 1–11 (1991). Although technically distinct, the terms are often used interchangeably, with no significant legal consequences. *Id.*

Trademark law recognizes four separate categories of marks, based on their levels of inherent distinctiveness. From most distinctive to least distinctive, these categories are: (1) arbitrary terms; (2) suggestive terms; (3) descriptive terms; and (4) generic terms. Although these categories are often separated by only the finest of lines,[5] the "distinctions are crucial," for:

If we hold a term arbitrary or suggestive, we treat it as distinctive, and it automatically qualifies for trademark protection at least in those geographic and product areas in which the senior user applies it to its goods. If we hold a mark descriptive, a claimant can still establish trademark rights, but only if it proves that consumers identify the term with the claimant, for that identification proves secondary meaning.... Finally, if we hold a designation generic, it is never protectable because even complete "success ... in securing public identification ... cannot deprive competing manufacturers of the product of the right to call an article by its name."

*Honickman,* 808 F.2d at 297 (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976)) (other citations omitted).

One question presented by this case is whether a service mark that corresponds to the markholder's telephone number may acquire trademark protection. The mere fact that the parties' marks correspond to their telephone numbers does not substantially alter our analysis.[6] Most courts to consider the question have held that marks which correspond to telephone numbers may be protectible. *See, e.g., Dial–A–Mattress Franchise Corp. v. Page,* 880 F.2d 675 (2d Cir.1989); *Murrin v. Midco Communications, Inc.,* 726 F.Supp. 1195 (D.Minn.1989); *American Airlines, Inc. v. A 1–800–A–M–E–R–I–C–A–N Corp.,* 622 F.Supp. 673 (N.D.Ill.1985); *Chicago World's Fair—1992 Corp. v. 1992 Chicago Worlds' Fair Comm'n,* No. 83–C–3424, slip op. (N.D.Ill. Aug. 16, 1983). *See also* 3 Rudolf Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 18.23, at 209 (Supp. Nov. 1991) ("Tele-

---

**5.** Or even by no line at all. *Compare A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 308 (3d Cir.1986) ("chocolate fudge" generic as to diet soda) *with A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 906 (7th Cir.1986) ("chocolate fudge" descriptive as to diet soda); *compare American Aloe Corp. v. Aloe Creme Lab., Inc.,* 420 F.2d 1248, 1252–53 (7th Cir.) ("alo-" generic for cosmetics), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970) *with Aloe Creme Lab., Inc. v. Milsan, Inc.,* 423 F.2d 845, 848–49 (5th Cir.) ("alo-" descriptive of cosmet-

ics), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970).

**6.** This fact may be relevant, however, in that it limits the universe of possible alternative marks available to competitors. For example, Dranoff–Perlstein's use of "INJURY–1" as its telephone number precludes competitors from using "INJURY–123," because the first seven digits, and hence the telephone numbers, are identical.

phone numbers may be protected as trademarks."). *But see Cytanovich Reading Ctr. v. Reading Game,* 162 Cal.App.3d 107, 208 Cal.Rptr. 412, 225 U.S.P.Q. (BNA) 588 (1984).

"[T]o function as a trademark, a term must be ... an indicator of source, sponsorship, approval or affiliation." *Honickman,* 808 F.2d at 305 (quoting S.Rep. No. 627, 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S.C.C.A.N. 5719). To the extent a mark that corresponds to a telephone number performs these functions, it may, if the other requirements of trademark law are met, be entitled to trademark protection. *Dial–A–Mattress,* 880 F.2d 675. As the United States Court of Appeals for the Second Circuit has noted, "Companies doing significant business through telephone orders frequently promote their telephone numbers as a key identification of the source of their products." *Dial–A–Mattress,* 880 F.2d at 678. Although law firms and other providers of services do not solicit "telephone orders," some firms do generate significant business through telephone inquiries. Like vendors of consumer products, service providers "frequently promote their telephone numbers as a key identification of the source" of their services.[7]

The use of telephone numbers as service marks appears to be a relatively recent phenomenon. As late as 1984, one court noted that it was unable to find any appellate cases on the question whether telephone numbers could constitute service marks. *Cytanovich Reading Ctr. v. Reading Game,* 162 Cal.App.3d 107, 208 Cal. Rptr. 412, 225 U.S.P.Q. (BNA) 588 (1984). Even today, the only federal appellate case addressing whether telephone numbers may receive trademark protection appears to be the decision of the United States Court of Appeals for the Second Circuit in

*Dial–A–Mattress Franchise Corp. v. Page,* 880 F.2d 675 (2d Cir.1989). In *Dial–A–Mattress,* the court affirmed the district court's order enjoining defendant from using the telephone number "1–800–MATTRESS" in regions in which the plaintiff corporation had previously solicited telephone orders at the number "(area code)-MATTRES." The court held that "a competitor's use of a confusingly similar telephone number may be enjoined as both trademark infringement and unfair competition." *Id.* at 678 (citations omitted). The court further held that even telephone numbers that correlated to generic terms were protectible; in its view, the principles limiting trademark protection for generic terms did not allow competitors to adopt a telephone number that was confusingly similar to that of the plaintiff, even if the plaintiff's telephone number correlated to a generic term. *Id.*

Relying in part on *Dial–A–Mattress,* the court in *Murrin v. Midco Communications, Inc.,* 726 F.Supp. 1195 (D.Minn.1989), enjoined defendant from using the telephone number 800–529–9377 ("800–LAWYERS") in a manner that would infringe plaintiff's service mark in the phrase "Dial LAWYERS." Specifically, the court enjoined defendant from "advertising or in any way using the telephone number (800) 529–9377 ... in conjunction with the word 'dial;'" and from "advertising or in any way using the telephone number (800) 529–9377 ... with any symbols resembling dots or hyphens between the letters of the word 'LAWYERS' when that word is used to indicate a telephone number." 726 F.Supp. at 1201.

The Second Circuit's decision in *Dial–A–Mattress* appears to hold that even if the letters correlating to a telephone number spell a generic term, that telephone number

---

**7.** In addition to INJURY–1 and INJURY–9, the *Bell of Pennsylvania Yellow Pages* for Philadelphia contain advertisements for legal services at the telephone numbers "1–800–229 4 INJURY," "1–800–mc–CLAIM," "LEGAL–10," "DIAL–LAW," "AID–7900" and "561–CALL." In the advertisement of one Philadelphia dentist, a smiling tooth holds a telephone receiver and urges prospective patients to "Dial DENTIST." Persons in need of a physician may dial "448–DOCS," "2–HEALTH," or "221–CARE." Local hospitals can be reached at "662–PENN," "1–800–EINSTEIN," "1–800–JEFF–NOW," or "1–800–654–GRAD." Although some of these mnemonics may contain generic terms that are ineligible for trademark protection, they certainly function as a key identification of the source of services.

may be subject to trademark protection, despite the fact that generic terms ordinarily are not protectible. However, as this court stated in *Honickman:*

> Underlying the genericness doctrine is the principle that some terms so directly signify the nature of the product that interests of competition demand that other producers be able to use them even if terms have or might become identified with a source and so acquire "de facto" secondary meaning.... Courts refuse to protect a generic term because competitors need it more to describe their goods than the claimed markholder needs it to distinguish its goods from others.

808 F.2d at 304. We see no reason to depart from this policy in the context of marks that correspond to telephone numbers. Therefore, we decline to adopt the position espoused by the Second Circuit that telephone numbers which correlate to generic terms may be protectible as trademarks.[8]

Generic terms are denied trademark protection because granting one firm their exclusive use would place competitors at a serious competitive disadvantage. 1 Gilson, *supra*, § 2.02, at 2–23. If telephone numbers that correlate to generic terms were granted protection, the first firm in a given market to obtain such a telephone number would, merely by winning the race to the telephone company,[9] gain an unfair advantage over its competitors. *See* Anthony L. Fletcher and David J. Kera, *The Forty–Third Year of Administration of the Lanham Trademark Act of 1946*, 80 Trademark Rep. 591 (1990).[10]

---

**8.** Thus, we cannot agree with the court in *Murrin v. Midco Communications, Inc.*, 726 F.Supp. 1195 (D.Minn.1989), that the mnemonic "DIAL L–A–W–Y–E–R–S" is protectible.

**9.** Any telephone number not currently in use in a given exchange may be obtained from Bell of Pennsylvania upon request and payment of a $100 fee.

**10.** The authors of that article stated:

> The unique effectiveness of the number ["L–A–W–Y–E–R–S" (529–9377)] results from the fact that LAWYERS, obviously, is generic for

## C.

Even though we decline to endorse the view of the courts in *Dial–A–Mattress* and *Murrin* that telephone numbers which correlate to generic terms may merit trademark protection, Dranoff–Perlstein would be entitled to prevail if its mark were found to be arbitrary, suggestive, or descriptive and possessing secondary meaning.[11] Therefore, we must determine whether the district court erred in holding that "INJURY–1" is either (1) "generic," or (2) "descriptive" and without "secondary meaning." This court has defined the relevant terms as follows:

> arbitrary (or fanciful) terms, which bear "no logical or suggestive relation to the actual characteristics of the goods;" suggestive terms, which suggest rather than describe the characteristics of the goods; descriptive terms, which describe a characteristic or ingredient of the article to which it refers, and generic terms, which function as the common descriptive name of a product class.

*Honickman*, 808 F.2d at 296 (emphasis added) (citing *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 374 n. 8 (1st Cir.1980)).

The mark is certainly not *arbitrary;* "INJURY–1" does bear some "logical or *suggestive* relation" to the services supplied by personal injury lawyers. Thus, the mark is either suggestive, *descriptive*, or *generic.*

Suggestive marks, like arbitrary marks, are "protected without any necessity for proving secondary meaning." 1 McCarthy, *supra*, § 11:20, at 488. "The descriptive-

---

lawyers, just as MATTRESS is generic for what the merchant in the prior case sold. It is rather difficult to understand why trademark law should protect such terms. Given modern telemarketing techniques, whoever obtains rights to such numbers and advertises them as LAWYERS (or MATTRESS) appears to have a significant competitive advantage. *Id.* at 675–76 (footnotes omitted).

**11.** Because a nonregistered mark carries no presumption of validity, the burden of proving the mark arbitrary, suggestive or descriptive lies with the plaintiff. *Honickman*, 808 F.2d at 297 (citations omitted).

suggestive borderline is hardly a clear one.... The most popular test with the courts is the 'imagination' test." *Id.*, § 11:21, at 491. One oft-quoted formulation of that test states:

A term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Honickman,* 808 F.2d at 297 (quoting *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479 (S.D.N.Y.1968)); *accord,* 1 McCarthy, *supra,* § 11:21, at 491–92. Under this test, the mark appears to be descriptive (or generic), because little imagination is necessary in order to get from "INJURY–1" to personal injury lawyers; the word "INJURY" "forthwith conveys an immediate idea of the ... characteristic[ ]" of the services provided. *Cf. Honickman,* 808 F.2d at 298 ("Because chocolate fudge denotes a flavor, no imagination is required for a potential customer to reach a conclusion about the nature of Canfield's soda.").

■ In addition to the amount of imagination required to connect the term in question with a characteristic of the product or service being marketed, courts have considered "whether sellers of similar products [or services] are likely to use, or actually do use, the term in connection with their goods." *Security Ctr., Ltd. v. First Nat'l Security Ctrs.,* 750 F.2d 1295, 1299 (5th Cir.1985). Frequent use of a term by sellers of similar products or services tends to indicate that the term is descriptive or generic rather than suggestive. *Id.* at 1300. Not surprisingly, the term "injury" is frequently used by personal injury lawyers in marketing their services.[12]

The policy underlying the distinction between descriptive and suggestive terms is that the automatic exclusion of a descriptive term from commercial use "would be commercially disruptive and unfair to competitors." *Security Ctr.,* 750 F.2d at 1300. Although the distinction between suggestive and descriptive marks "is, undoubtedly, often made on an intuitive basis rather than as the result of a logical analysis susceptible of articulation," *Union Carbide Corp. v. Ever–Ready Inc.,* 531 F.2d 366, 379 (7th Cir.1976), we are persuaded that "INJURY–1" lies on the descriptive side of that elusive boundary.[13]

Where a descriptive term has come to be identified with a single source of a product or service, competitors should not be allowed a "free ride" on the good will that source has created through its effort and investment. 1 McCarthy, *supra,* § 2.10, at 85. Therefore, a descriptive mark is protectible if it has acquired "secondary meaning." *Id.,* § 11:9, at 453–55.[14] One "excellent capsule definition of secondary meaning" states:

When a particular business has used words *publici juris* for so long or so exclusively or when it has promoted its product to such an extent that the words do not register their literal meaning on the public mind but are instantly associated with one enterprise, such words have attained a secondary meaning. That is to say, a secondary meaning exists when in addition to their literal, dictionary meaning, words connote to the public a product *from a unique source.*

1 McCarthy, *supra,* § 11:9, at 455–56 (quoting *Charcoal Steak House, Inc. v. Staley,* 263 N.C. 199, 139 S.E.2d 185 (1964)). In order for secondary meaning to exist, "it is not necessary for the public to be aware of the name of the [source].... It is sufficient if the public is aware that the product [or service] comes from a single, though anonymous, source." *Union Carbide Corp.,* 531 F.2d at 380. The factors rele-

---

**12.** The record contains the Philadelphia area "yellow pages" advertisements of no fewer than twenty local lawyers and law firms in addition to those of Dranoff–Perlstein and Harris J. Sklar. Each of these advertisements contains the word "injury" or "injured."

**13.** Of course, if a term is *too* descriptive, it may be generic and unprotectible. *See* discussion of genericness, *infra.*

**14.** A mark that is entirely generic, however, may never be protected as a trademark or service mark. 1 McCarthy, *supra,* § 12:1, at 520.

vant to determining whether a mark has acquired secondary meaning include:

the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion.

*Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir.), *cert. denied sub nom. Altran Corp. v. Ford Motor Co.*, —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (citations omitted).

"The question remains whether the term ... is descriptive because it only describes characteristics or functions of the product [or service] or whether it is so commonly descriptive of the name of the product [or service] that we should consider it generic." *Honickman*, 808 F.2d at 298.[15] The test for genericness is whether consumers think the term represents "the generic name of the product [or service] or a mark indicating merely one source of that product [or service]." 1 McCarthy, *supra*, § 12:2, at 522 (citing *Feathercombs, Inc. v. Solo Prods. Corp.*, 306 F.2d 251 (2d Cir. 1962)). *See also Honickman*, 808 F.2d at 292–93 ("The jurisprudence of genericness revolves around the primary significance test, which inquires whether the primary significance of a term in the minds of the consuming public is the product [or service] or the [source].").

"To be generic, a term need not relate directly to the name of the product [or service], but may relate to some distinctive characteristic of that genus of products [or services]." 1 McCarthy, *supra*, § 12:2, at 526. A term that is generic for one type of product or service may be non-generic for another. *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906 (7th Cir.1986).

*See, e.g., Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 n. 6 (2d Cir.1976) (term "Ivory" generic as to products made from elephant tusks but arbitrary as to soap).

"The line between highly descriptive marks and generic names is as fuzzy and undefinable as the line between descriptive marks and suggestive marks. However, the difference is crucial. If determined to be generic, that term can never function as a mark or be given trademark protection; but if determined to be descriptive, the word can be given trademark protection upon proof of secondary meaning." 1 McCarthy, *supra*, § 12:5, at 539 (footnotes omitted).

In deciding whether a term is generic, courts have focused on the availability of commonly used alternatives. *Honickman*, 808 F.2d at 306 n. 20. As we noted in *Honickman*:

[I]f no commonly used alternative effectively communicates the same functional information, the term that denotes the product [or service] is generic. If we held otherwise, a grant of trademark status could effectively prevent a competitor from marketing a product [or service] with the same characteristic....

*Id.* at 306.

■ Because telephone numbers contain only an area code and seven digits, the range of commonly used alternatives which effectively communicate the same functional information as the word "injury" is severely limited in that context. For example, the phrase "personal injury," while otherwise an effective substitute, is too long for use as a telephone number. If Dranoff–Perlstein could preclude competitors from using the word "injury" in their telephone numbers, it would achieve the kind of unfair competitive advantage the

---

**15.** Like the distinction between suggestive and descriptive terms, the descriptive-generic distinction is often somewhat elusive. *See Honickman*, 808 F.2d at 296 n. 8 (citing cases noting difficulty of distinguishing between descriptive and generic terms). *Compare Honickman*, 808 F.2d at 308 ("chocolate fudge" generic as to diet soda) *with A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906 (7th Cir.1986) ("chocolate

fudge" descriptive as to diet soda); *compare American Aloe Corp. v. Aloe Creme Lab., Inc.*, 420 F.2d 1248, 1252–53 (7th Cir.) ("alo-" generic for cosmetics), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970) *with Aloe Creme Lab., Inc. v. Milsan, Inc.*, 423 F.2d 845, 848–49 (5th Cir.) ("alo-" descriptive of cosmetics), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970).

genericness doctrine is supposed to prevent. *See* 1 Gilson, *supra,* § 2.02, at 2–23.

The determination whether the term "INJURY," as contained in "INJURY–1," is generic or descriptive depends in part on how we define the relevant product category, or "genus." *Honickman,* 808 F.2d at 298. If we define the genus as "lawyers," the term would appear to be descriptive. However, if we define the genus as "personal injury lawyers," the term would appear to be "so commonly descriptive of the name of the product [or service] that we should consider it generic." *Honickman,* 808 F.2d at 298.

As this court observed in *Honickman,* the usual tests for genericness provide little guidance on this issue. *Id.* at 301. After a thorough review of the law of genericness, the *Honickman* court stated:

> Although we do not believe we have derived a formula that will differentiate the product brand from the product genus in all cases, we believe that application of these general principles of trademark law to this case, which involves at best a descriptive word not a coined term, is straightforward. We hold as follows: If a producer introduces a product that differs from an established product class in a particular characteristic, and uses a common descriptive term of that characteristic as the name of the product, then the product should be considered its own genus. *Whether the term that identifies the product is generic then depends on the competitors' need to use it. At the least, if no commonly used alternative effectively communicates the same functional information, the term that denotes the product is generic.*

*Id.* at 306 (footnote and citations omitted; emphasis added).[16] It would appear that, at least with regard to personal injury lawyers, no commonly used alternative to the word "injury" would effectively communicate the same information, because the word "injury" is integrally related to a "distinctive characteristic" of the services being provided.

In recent years, the legal profession has become increasingly specialized. *See* William H. Rehnquist, *Dedicatory Address: The Legal Profession Today,* 62 Indiana L.J. 151, 153 (1987); *See also* Ronald J. Gilson and Robert H. Mnookin, *Symposium on the Law Firm as a Social Institution: Sharing among the Human Capitalists,* 37 Stanford L.Rev. 313, 328 (1985) (noting "historical pattern of increased specialization in the legal profession"). Many contemporary law firms, including Dranoff–Perlstein, confine their practice exclusively, or nearly so, to cases involving personal injury.[17] Within this practice area, competitors' need to use the term "INJURY" to describe their services is manifest. *See supra* note 12.

In light of the relevant factors identified in *Honickman,* we hold that personal injury law is properly regarded as its own genus, and that the term "INJURY," as contained in "INJURY–1," is "so commonly descriptive of the name of the [service] that we should consider it generic." *See Honickman,* 808 F.2d at 298 (citation omitted). Dranoff–Perlstein's competitors may not be precluded from using the term "INJURY" in their advertising, or even as part of their telephone numbers. To do so would be to deny competitors the right to call the practice of personal injury law by its name. *See Kellogg Co. v. Nat'l Biscuit Co.,* 305 U.S. 111, 119, 59 S.Ct. 109, 114, 83 L.Ed. 73

---

**16.** The *Honickman* court held that the introduction to the market of Canfield's "Diet Chocolate Fudge Soda" resulted in the creation of a new genus: "diet sodas that taste like chocolate fudge." Accordingly, it held the phrase "chocolate fudge" to be generic and unprotectible. 808 F.2d at 308. *But see Vess Beverages,* 796 F.2d at 906 ("chocolate fudge" descriptive and protectible upon a showing of secondary meaning).

**17.** Dranoff–Perlstein's advertisement in the *Bell of Pennsylvania Yellow Pages* lists the following practice areas: "Auto accidents," "Septa accidents," "Dangerous products," "Railroad/aviation," "Medical malpractice," "Wrongful death," "Slip & Fall," "Motorcycle accidents," "Toxic torts," "Work injuries," "Insurance claims," and "Serious injuries." All of these types of cases tend to involve some sort of physical injury to the plaintiff; hence the telephone number, "I–N–J–U–R–Y–1."

(1938) ("Like every other member of the public, [defendant] was, and remained, free ... to call [its] product by its generic name.").

That does not end our inquiry, however, because the mark for which protection is sought is not "INJURY" but "INJURY–1." According to Professor McCarthy, "[t]he validity of a mark must be determined by looking at the mark as a whole." 1 McCarthy, *supra*, § 11:10, at 458. However, "[a]dding a suffix to a generic term, such as 'ize' to 'Nylon' to produce NYLONIZE for treating fabrics with a nylon process, will not change the generic nature of the word." *Id.*, § 12:12(C), at 556 (citing *Scholler Bros., Inc. v. Bick, Inc.*, 110 U.S.P.Q. 431 (1956)). Furthermore, as the United States Court of Appeals for the Federal Circuit has stated:

> That a particular feature is descriptive or generic with respect to the involved goods or services is one commonly accepted rationale for giving less weight to a portion of a mark.... Without question, the descriptive or generic character of an expression which forms part of both marks under consideration is pertinent to the likelihood of confusion.... Where a descriptive [or generic] term forms part of two or more marks for related products [or services] ... the decisions recognize that the purchasing public has become conditioned to this frequent marketing situation and will not be diverted from selecting what is wanted unless the overall combinations have other commonality. In a sense, the public can be said to rely more on the non-descriptive [or non-generic] portion of each mark.

*In re Nat'l Data Corp.*, 753 F.2d 1056, 1058–59, 1060 (Fed.Cir.1985). *See also Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386 (Fed.Cir.1989) (court may properly give less weight to merely descriptive portion of composite marks in analyzing likelihood of confusion); 2 McCarthy, *supra*, § 23:15(F) (supp.1990 at 44) ("Descriptive or [g]eneric [p]ortion [of composite

mark] is [g]iven [l]ess [w]eight on the rationale that the public will look to other portions of the marks and will not be confused unless the other portions are similar.").

In an analogous case, the United States Court of Appeals for the Second Circuit considered a trademark infringement action involving two vaccines, one marketed under the name "HibVAX" and an identical vaccine marketed under the name "HIB–IMUNE." *American Cyanamid Corp. v. Connaught Lab., Inc.*, 800 F.2d 306 (2d Cir.1986). Both vaccines were used to immunize children against Haemophilus influenzae type b diseases, also known by the generic names "H–FLU" and "Hib." *Id.* at 307.

In analyzing the allegations of infringement, the court first recognized the principle that "[a] trademark holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term such as 'Hib.'" *Id.* at 308.[18] The court went on to state:

> This principle applies equally to a generic component of a trademark. Although such a component will not necessarily render the trademark invalid, its presence does affect the analysis of whether a competitor's mark containing the same component is likely to create confusion. As a result, because the generic term "Hib" may not be appropriated by [plaintiff] for its exclusive use, any likelihood of confusion between HibVAX and HIB–IMUNE, and any consequent finding of infringement, must be based on a similarity between the suffixes "VAX" and "IMUNE."

*Id.* at 308. *See also* 2 McCarthy, *supra*, § 23:15, at 89 ("If a common portion of the two conflicting marks is a public domain generic word, the emphasis of the enquiry should be upon the confusing similarity of the nongeneric portion, with the ultimate issue determined by the confusing similarity of the total impression of both marks."). Similarly, any finding of infringement here

---

**18.** As discussed above, generic terms may never receive trademark protection, while descriptive terms are protectible only upon a showing of "secondary meaning."

must be based primarily on a likelihood of confusion between the suffixes "1" and "9." [19]

Some of the cases involving alleged infringement of the mark "COCA–COLA" are useful by way of illustration. The word "COLA" has long been held to be generic and free for all to use. See Coca–Cola Co. v. Snow Crest Beverages, Inc., 162 F.2d 280, 283 (1st Cir.), cert. denied, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947); Dixi–Cola Lab., Inc. v. Coca–Cola Co., 117 F.2d 352, 360 (4th Cir.), cert. denied, 314 U.S. 629, 62 S.Ct. 60, 86 L.Ed. 505 (1941). The marks "TAKA COLA," [20] "CLEO COLA," [21] and "CUP–O–COLA" [22] have been held confusingly similar to "COCA–COLA." Conversely, the marks "DIXI–COLA," [23] "RONRICOLA," [24] and "POLAR COLA" [25] have been held not to be confusingly similar to "COCA–COLA." See 2 McCarthy, supra, § 23:15, at 90.

▆▆▆ The existence of secondary meaning and likelihood of confusion are questions of fact. See American Home Prods. Corp. v. Barr Lab., Inc., 834 F.2d 368, 370 (3d Cir.1987). Rather than attempting to resolve these factual questions on the record before us, we will remand the case to the district court for a determination of these issues. If it finds secondary meaning,[26] the district court should consider the likelihood of confusion between the two marks in their entireties, with the emphasis of the inquiry on the non-generic portions of the disputed marks. See 2 McCarthy, supra, § 23.15, at 89.

Likelihood of confusion exists " 'when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " Ford Motor Co., 930 F.2d at 292 (quoting Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir.1978)). " 'Proof of actual confusion is not necessary; likelihood is all that need be shown.' " Id. (quoting Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 195 (3d Cir.1990)). As we stated in Ford Motor Co., the likelihood of confusion analysis requires the evaluation of a number of factors, including:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods [or services] and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion aris-

---

19. In Country Floors, Inc. v. Partnership of Gepner & Ford, 930 F.2d 1056, 1063 (3d Cir.1991), this court held that "[a] person is liable to the owner of a mark under § 32 of the Lanham Act if he uses a confusingly similar mark. The marks need not be identical, only confusingly similar." Here, however, plaintiff alleges a violation of only § 43(a) of the Lanham Act; plaintiff's Complaint makes no mention of § 32, which deals with registered marks. A finding of infringement under § 43(a) must be based on a "likelihood of confusion," rather than a "confusing similarity," between the two marks. See American Home Prods. Corp. v. Barr Lab., Inc., 834 F.2d 368, 370 (3d Cir.1987).

20. Coca–Cola Co. v. Old Dominion Beverage Corp., 271 F. 600 (4th Cir.), cert. denied, 256 U.S. 703, 41 S.Ct. 624, 65 L.Ed. 1179 (1921).

21. Cleo–Syrup Corp. v. Coca–Cola Co., 139 F.2d 416 (8th Cir.1943), cert. denied, 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074 (1944).

22. Coca–Cola Co. v. Clay, 324 F.2d 198 (C.C.P.A. 1963).

23. Dixi–Cola Lab., Inc. v. Coca–Cola Co., 117 F.2d 352 (4th Cir.), cert. denied, 314 U.S. 629, 62 S.Ct. 60, 86 L.Ed. 505 (1941).

24. Puerto Rico Distilling Co. v. Coca–Cola Co., 120 F.2d 370 (C.C.P.A.1941).

25. Coca–Cola Co. v. Snow Crest Beverages, Inc., 162 F.2d 280 (1st Cir.), cert. denied, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947).

26. Although the district court stated an alternative holding that if INJURY–1 was descriptive, no showing of secondary meaning had been or could be made that would justify trademark protection, we believe the district court focused its analysis on its primary holding of genericness, and may not have fully considered the question of secondary meaning. We agree with the concurring opinion that "reasonable minds might differ about the existence of secondary meaning on the present record." Concurring opinion at 863.

ing; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods [or services], though not competing, are marketed through the same channels of trade and advertised through the same media;[27] (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods [or services] in the minds of the public because of the similarity of function ...

*Id.* at 293 (citing *Scott Paper Co.*, 589 F.2d at 1229).

### III.

For the foregoing reasons, we will reverse the order of the district court granting Sklar's motion for summary judgment, and remand for further proceedings consistent with this opinion.

STAPLETON, Circuit Judge, concurring.

I, too, would reverse the judgment of the district court and remand for further proceedings. My instructions to the district court, and my analysis supporting those instructions, would be different from those of the court, however.

If an advertisement does nothing more than instruct a reader to call 465–8791, this gives rise to no trademark or service mark protection under the Lanham Act or the common law of trademarks. The same is true if an ad does nothing more than tell a reader to call INJURY–1. As the court's opinion recognizes, such protection exists only when a mark is being used to identify the source of goods or services. Thus, a mnemonic that is utilized for no other purpose than to help a potential client remember a telephone number is not entitled to trademark protection.

Nevertheless, the plaintiff in this case has used the mark INJURY–1 in printed form as an identification of the source of the legal services plaintiff offers, and to that extent, I agree with the court that the Lanham Act and the common law of trade-

marks are implicated. I further agree with the court's statement at the beginning of its opinion, as contrasted with its later analysis, indicating that the memory-assisting function of a mnemonic is irrelevant to the issue of the validity of a mark.

Finally, I agree with the court that IN-JURY–1 is neither arbitrary nor suggestive when used to identify a source of legal services for persons who have suffered personal injury. Though the issue is a close one, I am persuaded that that mark is descriptive of such services in a manner sufficiently direct to foreclose its characterization as a suggestive service mark.

While I am in agreement with the court's opinion in the above respects, I am unable to join it. To begin with, I think it fundamental that the validity of a trade or service mark must be determined by considering the mark as a whole, not by dissecting and analyzing its component parts. As the Supreme Court has had occasion to observe:

"The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail. For this reason, it should be considered in its entirety...."

*Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46, 40 S.Ct. 414, 417, 64 L.Ed. 705 (1920); 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* 458 (1984).

Taking INJURY–1 as a whole, I would find that it is not generic when used to identify a source of legal services for those who have suffered personal injury. It may conceivably indicate to the public a *source* of such legal services; clearly, I think, it is not taken by the public as the name of *the services themselves.*

Having determined that the plaintiff's service mark is descriptive and not generic, I would remand for the district court to address, in turn and to the extent necessary, the issues of the existence of secondary meaning,[1] the likelihood of

---

**27.** Of course, where, as here, the services are competing, this factor does not apply.

**1.** The district court stated that "in the context of remembering and using a telephone number," neither party had shown "or could show" sec-

confusion,[2] and the extent and appropriateness of the various available remedies.

ondary meaning. I am not certain I understand the intent of this observation but it seems clear the district court believed that it was not possible for the plaintiff to prove relevant secondary meaning. I perceive no such barrier and believe reasonable minds might differ about the existence of secondary meaning on the present record.

2. While I would direct the district court to reconsider these issues in light of this court's opinion, I would offer some further guidance on the issue of the likelihood of confusion. Since I would stress that the memory-assisting function of the mark is irrelevant to the issue of validity, I would also expressly state that the context in which the mark is used, including any suggestion that the reader use it in connection with making a telephone call, is relevant to the issue of whether the public is likely to take INJURY–1 and INJURY–9 as referring to a single source of legal services for persons who have suffered personal injury.