**The GIDEONS INTERNATIONAL, INC.**

v.

**GIDEON 300 MINISTRIES, INC.**

**Civil Action No. 97–7251.**

United States District Court, E.D. Pennsylvania.

July 23, 1999.

Mary F. Platt, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Paul A. Alexis, Thor Y. Irness Cummings, Conners and Berry, Nashville, TN, for plaintiff.

Anthony J. Voci, Jr., Bala Cynwyd, PA, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT

HUTTON, District Judge.

Having considered all of the testimony and exhibits offered at trial, I now, pursuant to Federal Rule of Civil Procedure 52(a), make the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

### A. The Plaintiff's Contentions

1. The plaintiff, The Gideons International, Inc. (hereinafter "The Gideons" or the "Association"), has asserted that: (a) the use by the defendant, Gideon 300 Ministries, Inc. (hereinafter "Gideon 300"), of the name and mark "Gideon" within its name "Gideon 300 Ministries" constitutes unfair competition under Section 43(a) of the Lanham Act and infringes upon The Gideons' federal trademark rights and its rights at common law; (b) the subject marks are owned by The Gideons, and they are suggestive, thus inherently distinctive; (c) even if the marks were held to be merely descriptive, they have acquired a secondary meaning in the minds of the consuming public and have achieved incontestable status under the Lanham Act; (d) there is a strong likelihood of confusion in the public, and Gideon 300 has admitted to instances of actual confusion; and (e) Gideon 300 has diluted The Gideons' famous marks by blurring its name and mark with the marks of The Gideons. For these reasons, The Gideons contends that it should be granted a judgment on its claims for unfair competition, dilution and infringement, and that this Court should permanently enjoin Gideon 300 from using the mark "Gideon" or any confusingly similar name or mark. Compl., ¶¶ 15–34, Prayer for Relief at pp. 8–9 (Docket No.

1). During his opening statement at trial, The Gideons' counsel advised the Court that The Gideons is not seeking an award of damages or attorneys' fees against Gideon 300, but rather, simply an injunction compelling Gideon 300 to change its name. May 3 Tr., 13:9–13.[1]

### B. The Defendant's Contentions

1. In its Answer, Gideon 300 generally denied The Gideons' allegations of liability, Answer at ¶¶ 15–34 (Docket No. 4), but Gideon 300 did not specifically plead any affirmative defenses, id., p. 7. In its Amended Pretrial Memorandum, Gideon 300 stated that it was incorporated for the purpose of distributing food to the homeless, that it has never used The Gideons' name, or an amphora, in connection with its charitable activities, which it contends are not related to the distribution of Bibles, and that The Gideons have failed to produce any evidence of confusion or an expert witness. Am. Pretrial Mem. at pp. 1–2 (Docket No. 28). In his opening statement at trial, Gideon 300's counsel did not further identify any particular legal defenses that Gideon 300 relied upon, but asserted that the Court should take into account Gideon 300's intent in adopting its name, that the name (according to Gideon 300) "came from God, he developed that name," May 3 Tr. 14:5–6, that the evidence would show that there is no harm in allowing Gideon 300 to maintain their homeless ministry under the present name, id., 14:12–14, that the Court does not need to and should not take into consideration whether Gideon 300 will be harmed if forced to change its name, id., 14:16–18, and that Gideon 300's use of Gideon 300 Ministries, Inc. as its name is both proper and not in any way intended to harm or

---

1. References herein to the evidence adduced at trial follow the citation conventions described below:

Trial testimony: [Witness name] Test., [the day of trial, there being two transcript volumes, one for May 3 and one for May 4] Tr., [transcript page number: transcript page line numbers].

E.g.: Burden Test., May 3 Tr., 7:3–4

Trial exhibits: Ex. [the proponent of the exhibit, abbreviated "P" for plaintiff and "D" for defendant], [further identifying information, such as a page number]

E.g.: Ex. P–1, pp. 1–3.

dilute The Gideons' name. *Id.,* 14:23–25. Although not articulated in this way, Gideon 300's essential argument is that there is not a likelihood of confusion between its name or marks and those of The Gideons.

## C. *The Plaintiff and its Activities*

1. The Gideons is an association of Christian business and professional men, organized in 1899. Burden Test. May 3 Tr., 16: 17–19. It serves as an extended missionary arm of the church and is the oldest Christian business and professional men's association in the United States. Ex. P–3, p. 2. It is interdenominational in its scope and worldwide in outreach, operating in 172 countries. Burden Test., May 3 Tr., 16:19–20. In 1908 The Gideons adopted as a part of its ministry the goal of placing a Bible in each hotel room in the United States, *id.,* 21:12–24, and Bible and Testament placement is one of the organization's major activities. *See generally,* Exs. P–1, P–2, P–3.

2. The Gideons have used the names GIDEON and GIDEONS in connection with its activities since its inception, and The Gideons first began to use the names and marks GIDEON and GIDEONS in interstate commerce in connection with its services described above in 1903 on magazines and other printed literature and has continued and expanded upon that use up to the present time. Ex. P–1, *Sowers of the Word, A 95–Year History of The Gideons International,* pp. 309–316; Ex. D–6, ¶¶ 3–5; Compl., ¶ 7.

3. The Gideons is the owner of the following United States Trademark Registrations: No. 677,829 for GIDEON and amphora design, registered on April 28, 1956; Ex. P–13, p. 8; Compl., ¶ 8, Ex. A; No. 631,355 for GIDEON and amphora design, registered on July 24, 1956, Ex. P–13, pp. 1–7; Compl., ¶ 9, Ex. B; No. 635,-619 for GIDEON wreath and amphora design, registered on October 9, 1956, Compl., ¶ 10; and No. 89,839 for amphora design, registered on January 14, 1913, Ex. P–13, pp. 9–11. The Gideons also claims common law rights to the names and marks GIDEON and GIDEONS based upon its use of such names and marks which are superior to any rights which Gideon 300 may claim in and to said marks or the confusingly similar names and marks "Gideon 300" and "Gideon 300 Ministries." Compl. ¶ 11, p. 3 (Docket No. 1). The Gideons do not claim that its amphora symbol has been used by Gideon 300. Burden Test., May 3 Tr., 81:21–24.

4. The Gideons' nondenominational Christian ministry involves approximately 135,000 members in 172 countries around the world, more than 85,000 in the United States and about 50,000 in other countries, plus approximately 80,000 women involved in a women's auxiliary ministry. Burden Test., May 3 Tr., 24:9–13; Ex. D–6, ¶ 2. Its volunteer membership donates their time without charge to place and distribute Bibles and New Testaments and engage in related activities. Burden Test., May 3 Tr., 32:13–16; Ex. D–6, ¶ 2.

5. The first meeting of The Gideons was on July 1, 1899, at Janesville, Wisconsin. Ex. P–1; Ex. D–6, ¶ 3. Three traveling salesman met at that time and, after consideration as to what the name of the newly formed Association should be, and after prayer devoted to the same, decided that their members would be called "Gideons," after the story in the sixth and seventh chapters of the Book of Judges in the Holy Bible. Burden Test., May 3 Tr., 20:21–21:11; Ex. P–1. The origins of the Association go back even further, to the autumn of the year 1898, when two of the three original founders, both traveling salesman, met at the Central Hotel at Boscobel, Wisconsin. Burden Test., May 3 Tr. 19:25–20:20; Ex. D–6, ¶ 3. The history of The Gideons, including further details concerning how The Gideons have made extensive use of the names "Gideon" and "Gideons" over the years, is described in great detail in the book *Sowers of the Word. A 95–Year History of The Gideons International.* Ex. P–1.

6. Since 1908, The Gideons have distributed more than 818 million Bibles, New Testaments and special Scriptures around

the world, more than 256 million of which have been distributed in the United States. Exs. P–1, P–2, pp. 169–72; Ex. D–6, ¶ 5. In addition to English language Bibles and Testaments, The Gideons also distribute translated texts of the Bible and New Testament in 77 foreign languages in more than 170 countries. *Id.*

7. As of May 31, 1998, The Gideons had placed 257,088,482 Bibles and Testaments in the United States, and 818,023,040 Bibles and Testaments worldwide. Ex. P–2, pp. 169–72; Ex. D–6, ¶ 5.

8. The Gideons place Bibles in hotels and motels, hospitals, penal institutions, schools, colleges and universities, courtrooms, bed and breakfast inns, transient efficiency apartments, airplanes, steamships, trains, physicians' (including osteopaths, chiropractors and outpatient clinics) offices, dentists' offices, military day rooms, libraries, bases, recruiting offices, guardrooms and chapels, funeral homes, and nursing or convalescent homes. Ex. P–3; Ex. D–6, ¶ 6; Burden Test., May 3 Tr., 35:2–36:3. Unlike other Bible societies, such as the American Bible Society, The Gideons do not sell Bibles to the public. *Id.,* 36:10–37:7. Gideon members place Bibles both on their own initiative and at the request of hotels and motels. *Id.,* 42:25–44:2; Ex. P–11.

9. In addition to its Scripture distribution and Bible placement activities, The Gideons also meet together on a regular basis, conduct retreats, make presentations regarding their activities at various venues, including churches, and exhibit booths at state fairs, county fairs, exhibitions and the like, at which they display Gideon Scriptures and tracts and other promotional material. Burden Test., May 3 Tr., 25:9–27:13; Ex. D–6, ¶ 7. Representative samples of such promotional materials were presented at trial. Exs. P–4A–P–4N.

10. Since approximately 1908, when the suggestion was made that churches fund the Bibles placed in local area hotel rooms, churches have been a primary source of funds for The Gideons. Burden Test.,

May 3 Tr., 22:1–13. Approximately 65% of The Gideons' funds are from churches. *Id.,* 74:8–12. As Jerry Burden, Executive Director of The Gideons, testified at trial, The Gideons have long been inextricably tied to churches, where Gideon members go on a regular basis to share information and to encourage church members to participate financially in The Gideons' ministry. *Id.* Voluminous examples of The Gideons' promotional literature displayed at and distributed to churches were presented at trial. Ex. P–4A–4N. Mr. Burden testified that between five and six million brochures or pamphlets carrying the GIDEON mark and name are distributed in churches each year. Burden Test., May 3 Tr., 61:18–24; Exs. P–4G, P–4H. He also testified that other Gideons literature, Exs. P–4C–4E, is distributed at churches, their volume being from several thousand to 20 to 30 thousand per year. Burden Test., May 3 Tr., 61:4–11. The additional documents in The Gideons' Collective Ex. P–4 are representative examples of The Gideons' promotional literature, according to Mr. Burden. *Id.,* 60:18–62:16.

11. For almost 100 years, the Gideons has published a monthly magazine titled *The Gideon.* Ex. D–6, ¶ 13; Burden Test., May 3 Tr., 63:11–25. *The Gideon* is distributed to Gideon members and to others and includes educational, training and inspirational materials, including "testimonies," stories of the impact that Gideon Bibles have had on people. *Id.* A set of *The Gideon* magazines from January 1998 through April 1999, each including such testimonies, was presented at trial. Ex. P–5A–P–5O. Approximately 95,000 issues of *The Gideon* magazine are distributed every month in the United States and around the world. Burden Test., May 3 Tr., 64:1–3; Ex. D–6, ¶ 13. Additional testimonies appear in other publications of The Gideons. Ex. D–6, ¶ 13, Ex. 5; Exs. P–41–P–4N.

12. Gideon members are all members of local camps, which typically consist of approximately 28 to 30 Gideon members

each. Burden Test., May 3 Tr., 29:15–18. There are more than 2,900 camps in the United States, including eight camps in the greater Philadelphia area and several more on the outskirts of Philadelphia. *Id.,* 29:9–12.

13. The Gideons spend approximately $60 million each year on Bibles, and from $30 to $31 million is paid each year to National Bible Press in Philadelphia. Burden Test., May 3 Tr., 38:4–16. National Bible Press in Philadelphia has published Gideon Bibles for 60 years. *Id.,* 36:4–9. All Bibles distributed to the public by The Gideons have the Gideon name on them. *Id.,* 38:20–25.

14. At the camp level, Gideon members attend monthly camp prayer meetings, engage in personal witnessing, Scripture placements, new member recruitment and report to churches. Ex. D–6, ¶ 8; Ex. P–2, pp. 37–50. Each camp has a cabinet which meets on a regular basis. *Id.* The United States Gideon membership is further divided into 10 regional zones, each zone consisting of a number of states. *Id.* There are also 44 state Gideon associations in the United States, the state Gideon associations conduct their own cabinet meetings, zone rallies, state conventions, and state training conferences, and the state association presidents attend conferences at The Gideon's International headquarters in Nashville, Tennessee. *Id.*

15. On an international level, there are 16 Gideon national associations which are organizations outside of the United States, and all countries outside the United States are organized into one of 11 areas. Ex. P–2; Ex. D–6, ¶ 8. There are also self-supporting national associations and there are well-defined committees and cabinet structures within The Gideons' International membership, as well. *Id.*

16. The organizational structure of The Gideons and the policies and procedures which Gideon members are required to follow are very important to the success of the Association and its ministry. Ex. P–2; Ex. D–6, ¶ 9. According to Mr. Burden, the discipline, training and the very strict policies and procedures which govern the manner in which Gideon members perform their public activities (set forth in The Gideons' *Guide Book,* Ex. 3; Trial Ex. P–2) are also critical to the organization and its work. Ex. D–6, ¶ 9; Burden Test., 26:5–10.

17. The un-rebutted testimony of Mr. Burden established that The Gideons' extremely large membership is united in carrying out the same program using the same methods to accomplish the organization's constitutional objective of winning others to Christ, and the Association's policies are important because larger numbers of new members join it every year. Ex. D–6, ¶ 9; Ex. P–2, pp. 111, 114. The high esteem in which The Gideons is held by members of the public at large is due in large part to its members' strict observance of these policies and procedures. *Id.* Burden Test., May 3 Tr., 49:5–50:10. Mr. Burden testified based on his experience that The Gideons and its members are held in extremely high esteem, citing as examples the routine giving of hotel and motel passkeys to Gideon members so they may place Bibles in hotel rooms and the allowance of Gideon members into military induction and enlistment centers to present testaments. *Id.*

18. The Court notes that The Gideons' *Guide Book* contains a series of detailed policies and procedures that govern the organization's members' public and non-public or association-level activities, including scripture distribution, offerings, church meetings, camp meetings, advertising, and publicity policies. Ex. P–2, pp. 111–45. The Court also notes that The Gideons publishes in its *Guide Book,* which is distributed to Gideon members, policies governing the use of the GIDEON name and emblem. *Id.,* pp. 116, 118–20. One such policy provides as follows:

> The Gideon name and emblem are registered as a trademark with the governments of more than 190 countries. No *brochure, tract, folder, pamphlet, form, book, video cassette, cassette tapes,*

*slide presentation, display, podium, rostrum,* etc. is to be published, *manufactured or produced* in the name of The Gideons International and/or using The Gideon emblem except those authorized by The International Cabinet or a committee appointed by the Cabinet (usually the *Executive Committee* ). This policy applies to manufactured products including novelty items such as jewelry, pen sets, wearing apparel, etc. . . .

*Id.,* p. 111.

19. As another example, The Gideons do not solicit funds publicly. *Id.* Its primary public activity is the distribution of Bibles and Testaments, and its policies provide that it will do so wholly in keeping with the law of the land, largely to avoid compromising the future work of the ministry. Ex. P–2, pp. 126–38. Accordingly, in the view of The Gideons, any activity by a person using the name "Gideon" or "Gideons" which is inconsistent with its practices has the potential to damage the reputation of the Association in the public's eye and to disturb the uniformity with which The Gideons has operated publicly for 100 years. *Id.;* Ex. D–6, ¶ 9. The Gideons also believes that the good will that the public associates with its organization would be damaged if other religious ministries that are not established churches, such as Gideon 300 in this action, were to use the "Gideon" name, which has come to be known in the public's mind as synonymous with The Gideons.

20. The Gideons focus on being what it calls "a disciplined ministry," Ex. P–2, p. 1, carries over into its fund raising activities. Mr. Burden testified that The Gideons have approved methods of fund raising which must be followed. Burden Test., May 3 Tr., 46:18–49:4. Mr. Burden explained that The Gideons participate with about 208,000 Protestant churches in the United States, of which approximately 75,-000 are visited by Gideons on an annual basis, and that members of those churches have an expectation as to what will be done with monies they donate to The Gideons. *Id.* The uniformity of The Gideons' message and publications is also deemed important by the organization to its identity in the public's mind. *Id.* Because so much of its work is performed in churches, The Gideons is legitimately concerned about other groups, such as Gideon 300, bearing the GIDEON name and there being a reasonable basis for confusion, especially at churches which may be involved with each organization. *Id.*

21. The Court also notes that The Gideons has a strict policy against publicity and advertising. Ex. P–2, pp. 117–20; Burden Test., May 3 Tr., 50:14–51:11. Notwithstanding this policy, the activities of The Gideons' members for the last century in distributing Bibles on the massive scale referenced above had resulted in a significant amount of unsolicited press coverage regarding The Gideons and its activities. Ex. P–7; Ex. D–6, ¶ 10; Burden Test., May 3 Tr., 51:17–52:21. Various newspaper articles and other publications regarding or mentioning The Gideons' activities were presented at trial. *Id.* These articles, which are only a representative sampling of such articles in the files of the Association, are from such well-known publications as *USA Today, The Boston Globe, Christianity Today, National Catholic Reporter, Chicago Tribune, The Daily Oklahoman, The Dallas Morning News, The Arizona Republic,* the *Knight–Ritter* and *Associated Press* wire services, as well as smaller newspapers and periodicals such as Mandarin (FL) *News, The North Platte* (NB) *Telegraph, The Alton* (MO) *Telegraph, Fundamentalist Journal, The Duluth News–Tribune, Twin Falls* (ID) *Time–News, Amarillo* (TX) *Globe–News,* and *The Greensboro* (NC) *News and Record. Id.*

22. The "Gideon" and "Gideons" names are also associated in popular culture with the Association due to the widespread scope of the Association's work. Burden Test., May 3 Tr., 54:25–58:8; Ex. D–6, ¶ 11. For example, the Beatles' song "Rocky Raccoon" refers to a Gideon Bible, as does a character in the musical "Guys and Dolls." *Id.*

23. Gideon Bibles have also been used in movie productions. Presented at trial was correspondence regarding The Gideons' approval of the use of a Gideon Bible as a part of the recent motion picture "Mission: Impossible," starring Tom Cruise, John Voigt and others. Burden Test., May 3 Tr., 55:9–57:19; Ex. D–6, ¶ 11; Ex. P–8. The Gideons has also declined the use of its name and Bibles in films that are not in keeping with its mission. *Id.* Two letters to production companies who have requested such permission were entered into evidence, including the proposed use of a Gideon Bible in an upcoming motion picture starring Arnold Schwarzenegger. *Id.* Mr. Burden also testified that to his knowledge the Gideon name had never been used in a movie without The Gideons' permission. *Id.,* 57:17–19.

24. The Gideons' activities have even been the subject of such well-known cartoon features as "BC" and the "Wizard of Id," copies of which were also entered into evidence. Ex. P–8; Ex. D–6, ¶ 11; Burden Test., May 3 Tr., 57:22–58:3.

25. The Gideons have enjoyed the respect of national and international leaders and many American presidents have publicly accepted dignitary Gideon Bibles as described and depicted in the book *Sowers of the Word,* and as testified to by Mr. Burden. Ex. P–1; Ex. D–6, ¶ 12; Burden Test., May 3 Tr., 58:11–21.

26. As an example of the long-standing and high regard many leaders have had for The Gideons and its activities, The Gideons introduced into evidence a copy of a telegram from General Douglas MacArthur received by The Gideons in April 1950, in which General MacArthur solicits the assistance of The Gideons in providing copies of Scripture for Japanese citizens in connection with the democratization of the Japanese nation. Burden Test., May 3 Tr., 58:21–59:16; Ex. P–9; Ex. D–6, ¶ 12.

27. Gideon Testaments have even traveled in outer space, and were carried and read from by members of the Apollo 8 lunar mission in 1968 when they circled the moon, which the astronauts mentioned in national interviews upon their return. Ex. P–1, pp. 90, 116–17; Ex. D–6, ¶ 12.

28. According to the accounts in The Gideons' publications, many persons have improved their lives through exposure to Scripture enabled by The Gideons' activities. Ex D–6, ¶ 13; Exs. P–4I–4N, 5A–5D, 6A–6C.

29. Most dictionaries even have a separate definition under the word "Gideon" that references the Association. In this regard, The Gideons filed a Motion for Judicial Notice of Adjudicative Fact, requesting the Court to take judicial notice of the fact "[t]hat the names and marks 'Gideon' and 'Gideons' have developed a secondary meaning, namely, that they refer to members of The Gideons and to The Gideons organization." (Docket No. 29). In support of such motion The Gideons attached seven dictionary definitions which refer to The Gideons, arguing that the names and marks "Gideon" and "Gideons" are so strong that the dictionary definition specifically refers to the plaintiff, and citing the Third Circuit's approving citation of Professor McCarthy's definition of secondary meaning:

> When a particular business has used words publici juris for so long or so exclusively or when it has promoted its product to such an extent that the words do not register their literal meaning on the public mind but are instantly associated with one enterprise, such words have attained a secondary meaning. That is to say, a secondary meaning exists when in addition to their literal, dictionary meaning, words connote to the public a product from a unique source.

*Dranoff–Perlstein Associates v. Sklar,* 967 F.2d 852, 858 (3d Cir.1992) (quoting 1 *McCarthy's Trademarks and Unfair Competition* § 11:9, at 455–56 (2d ed.1984) (quoting *Charcoal Steak of Charlotte House, Inc. v. Staley,* 263 N.C. 199, 139 S.E.2d 185 (1964))). Gideon 300 did not oppose such motion, which was granted

after oral argument on the motion at the beginning of the trial on May 3, 1999. May 3 Tr., 2:4–5:22 (Docket No. 35).

30. The Court finds the foregoing facts clearly establish, as discussed further below, that The Gideons' names and marks are extremely strong, well-known and famous marks as a matter of fact and law.

## D. *The Defendant and its Activities*

1. Gideon 300, a Pennsylvania corporation with its offices in Willow Grove, Pennsylvania 19090, is a Christian ministry that engages in the following activities, among others: raising funds for its activities, Exs. P–20–P–23, D–1, D–2, D–3, D–5 (newsletters, appeals for funds and other promotional literature of the defendant); feeding homeless persons, Jenkins Test., May 3 Tr., 95:1–8; witnessing, *id.*; sponsoring and presenting prayer meetings, revival meetings, conferences and concerts, *id.*, 102:15–103:1, at which brochures and flyers identifying Gideon 300 are distributed, *id.*, 103:2–16; sponsoring a "Read the Bible in a Year" program, *id.*, 100:22–101:10; Ex. P–20, P. 5; and distributing religious tracts, *id.*, 101:19–21. Gideon 300 also sponsors a dance outreach program, a foster care support program and a program to collect and distribute blankets to homeless persons. *Id.*, 103:24–104:11.

2. Gideon 300 is also, like The Gideons, a Christian ministry, Jenkins Test., May 3 Tr., 94:19–96:4, and according to its Articles of Incorporation,

> The express purpose of the Corporation is to preach, spread and promote the Gospel of Jesus Christ of Nazareth by proclaiming the Word of God, the Holy Bible, both Old Testament and New Testament, in every media and means known to or to be known to man, for the eternal healing, deliverance and prosperity of all who will or may believe in Jesus of Nazareth . . . .

Ex. P–18, p. 3; Jenkins Test., May 3 Tr., 95:18–96:4. Gideon 300's By–Laws similarly begin as follows: "Foremost in the operation of this corporation and its by-laws is the word of God as taught in Old

and New Testaments of the Holy Bible." Jenkins Test., May 3 Tr., 96:17–21. While Mr. Jenkins attempted to distinguish his organization's Christian ministry from that of The Gideons, he eventually admitted the obvious—that part of Gideon 300's mission is to share the Gospel of Jesus Christ. *Id.*, 97:20–21.

3. In connection with its activities, Gideon 300 distributes on an annual basis approximately 15,000 pieces of literature with the names Gideon 300 and/or Gideon 300 Ministries thereon. Jenkins Test., May 3 Tr., 103:14–23. Gideon 300 has also advertised on the radio. *Id.*, 114:19–20. It has also been featured in a Philadelphia television news feature, *id.*, 114:9–18, and written up in *Main Line Life,* a local newspaper, *id.*, 114:21–23; Exs. P–24, D–7, D–13.

## E. *Defendant's Prior Knowledge of the Plaintiff*

1. Mr. Jenkins admitted that he did not conduct any search concerning the name Gideon or Gideon 300 before he made the decision to use it, Jenkins Test., May 3 Tr., 116:9–15, but he was nonetheless well aware of The Gideons and its name and activities before selecting the name Gideon 300 Ministries:

Q. Well, your view, Mr. Jenkins, of the Gideons has come about from long exposure to the Gideons, correct?

A. I know they put Bibles in hotels.

Q. Well, you've known of them all your life, haven't you?

A. I wouldn't say all my life, but a good majority of it, yes.

Q. Well, in your deposition you said you've known about them all your life, do you remember saying that?

A. I don't recall, but I would say I've known them pretty much all of—you know, a great portion of my life. When I went into a hotel and I saw the Bible, every Gideon, I saw the Gideon Bible there. I wouldn't say being one or two years old that

being part of my life, that I would have known that they're—known them all my life.

Q. All right. Well, I'm not quibbling with you in that regard, Mr. Jenkins. You did agree in your deposition—

A. Okay.

Q.—that they were very well known, correct?

A. Yes.

Q. And you also said that there's no doubt about who they are?

A. That's correct.

*Id.,* 99:25–100:21.

2. These admissions by the president of the defendant that The Gideons is "well-known," that "there's no doubt who they are" and that he has "known about The Gideons pretty much all [his] life" are consistent with the fact that The Gideons is very well known, as are the names by which it and its members are known. These facts were undisputed at trial, Gideon 300's counsel even stating, "the defense would also concede the plaintiffs do have a strong mark with respect to their name." May 3 Tr., 5:18–20.

3. By contrast to The Gideons' organization structure, which is led by an international board of 18 directors from nine countries, Burden Test., May 3 Tr., 17:9–12, Gideon 300 is led essentially by one person, Brian Jenkins. Mr. Jenkins testified that he "finalize[s]" all decisions of his organization, Jenkins Test., May 3 Tr., 94:10, but it is apparent that for all intents and purposes, Mr. Jenkins runs Gideon 300, and Gideon 300's By–Laws give the president virtually unlimited powers of corporate governance. Specifically, the president of Gideon 300 is also its board chairman, and Mr. Jenkins has the sole power to appoint members to the board of directors. Gideon 300 By–Laws, Art. II, Sec. 1, 2, Ex. P–18. Gideon 300's By–Laws also provide that "[t]he business of the corporation shall be managed by its Board of Directors under the final authority of the President–Chairman of the Board of Directors as to all decisions set forth in

these By–Laws. Otherwise stated, no decision shall become a corporate act without approval from the President–Chairman of the Board of Directors." *Id.,* Sec. 3. In another By–Law provision it is stated that "[i]f the President–Chairman of the Board of Directors shall take any action which is intended as a corporate act, such action shall be as valid as a corporate action as though it had been authorized at a meeting of the Board of Directors. However, no corporate act shall take place or be authorized without the approval of the Chairman of the Board of Directors." *Id.,* Sec. 8. These provisions render Gideon 300's board of directors superfluous, and Mr. Jenkins admitted upon cross-examination by the Court that he runs Gideon 300 with an iron hand and that its board of directors has no authority unless Mr. Jenkins says it does. Jenkins Test., May 4 Tr., 76:14–17.

4. From its inception until sometime in 1999 before the trial, Gideon 300 had only two board members, Mr. Jenkins and W. Byron Battle. Ex. P–18, p. 6. Mr. Jenkins disclosed upon cross-examination by the Court—not having supplemented his discovery disclosures and responses to The Gideons as required—that he had recently added additional directors, bringing the total number to seven. Jenkins Test., May 4 Tr., 73:10–74:11. Based upon the testimony of Mr. Jenkins, little attention has been paid by Mr. Jenkins and Gideon 300 to matters of corporate governance and record keeping. Gideon 300 is exempt from taxes under Section 501(c)(3) of the Internal Revenue Code of 1986 and a considerable number of persons donate funds to Gideon 300. Ex. P–27.

5. Mr. Jenkins testified on the first day of trial that on numerous occasions he received what he called "honorarium[s]," and that for the first year of Gideon 300's existence (1996), "at least half" of its $6,000 budget came from donations from Mr. Jenkins and his wife, which he described as follows:

**576**

A. It was at least half, at least half. I know we got contributions as far as from churches that I preached at and they would, as normal, you know, when preachers go out to preach they get an honorarium, an offering. I was just basically giving my donations that I was received directly to the ministry.

Jenkins Test., May 4 Tr., 180:4–9.

### F. *Instances of Actual Confusion*

1. Gideon 300 admitted to instances of actual confusion. Mr. Jenkins admitted that, on at least two occasions when he was passing out flyers for Gideon 300, people have come up to him and asked him if he was affiliated with The Gideons in any way. Jenkins Test., May 3 Tr., 110:12–18; 111:24–112:25. While Mr. Jenkins argued that these persons were not confused, their inquiries of Mr. Jenkins clearly indicate confusion on their part, since there is no other plausible explanation for them to ask Mr. Jenkins if he was affiliated in any way with The Gideons, nor did Mr. Jenkins offer a plausible alternative explanation for these questions. These admissions by Gideon 300 through Mr. Jenkins' testimony of *actual* confusion (and that people have an expectation that Gideon 300 is affiliated with others, specifically including The Gideons), coupled with the other undisputed facts in this case, establish a clear likelihood of confusion between the parties' names and marks, as discussed further below.

2. Mr. Jenkins admitted that he has seen Gideons literature displayed in at least two churches which are also involved with and support Gideon 300. Jenkins Test., May 3 Tr., 109:16–110:3. The common presence of the two organizations' literature at these churches enhances the likelihood of confusion between the parties' names and marks, as discussed further below. Burden Test., May 3 Tr., 82:1–11. That The Gideons has a ministry (involving regular preaching and scripture distribution) to rescue missions, where many homeless people congregate, also enhances the likelihood of confusion. *Id.,* 77:10–21.

3. Gideon 300 has also engaged in activity evidencing an intent to represent an affiliation with The Gideons, to cause confusion, and to benefit from The Gideons' good will and well-known name. According to the testimony of Irven Simpkins, a school psychologist from Elsinboro, New Jersey, who is also a Gideon member, in June 1997, Gideon 300 representatives distributed Gideon 300 promotional flyers at a Promise Keepers rally at RFK Stadium in Washington, D.C. Simpkins Test., May 3 Tr., 133:9–20, Ex. P–15. Mr. Simpkins, who had traveled to the rally with members of his church, was handed a Gideon 300 flyer, Ex. P–15, saw the name Gideon, and asked the person who handed him the flyer (whom he identified as Mr. Jenkins) what camp he was with, and Mr. Jenkins said Philadelphia in response. Simpkins Test., May 3 Tr., 135:19–25. Mr. Simpkins, as a Gideon member, was left with the affirmative impression that Mr. Jenkins was with The Gideons. *Id.,* 135:19–25. ("I put my hand out and took one, saw the name Gideons and I said, 'Oh, you're with the Gideons' and he responded that he was, yes." *Id.,* 144:18–20.) It was also Mr. Simpkins' initial impression that The Gideons organization was handing out the Gideon 300 flyers. *Id.,* 141:17–142:1. Mr. Simpkins was concerned that Gideon 300 was using The Gideons' name and felt that it was not right, so he notified The Gideons and forwarded a copy of the Gideon 300 brochure to Mr. Burden with a note stating that he thought Gideon 300 was possibly violating the Gideon name and trademark. *Id.,* 136:4–137:10; Ex. P–15.

4. Another Gideon member, a retired masonry business owner named Robert Gehman, also testified at trial. Mr. Gehman, who has been a Gideon member for 28 years and is very familiar with the organization and its work, sent to The Gideons' main office in Nashville, Tennessee a notice from the Montgomery County Law Reporter dated September 26, 1996, giving notice of the incorporation of Gideon 300. Gehman Test., May 3 Tr., 86:7–88:22. Another Gideon member brought

up the notice at a prayer meeting of Mr. Gehman's Gideon camp, of which he was president at the time, and the Gideon members present, being concerned about the name Gideon, discussed who Gideon 300 was and whether they would take advantage of The Gideons' name, especially as to solicitation. *Id.*, 89:18–90:2.

5. As discussed further below, a likelihood of confusion between the parties' respective names and marks was established by the evidence adduced at trial. Such facts also establish the elements of The Gideons' dilution causes of action, which is also addressed below.

## II. *CONCLUSIONS OF LAW*

### A. *Unfair Competition and Trademark Infringement under the Lanham Act*

1. The Third Circuit adheres to the dominant test for federal unfair competition under Section 43(a) of the Lanham Act, which is generally the same standard as applies to causes of action for federal trademark infringement under Section 32(1) of the Lanham Act. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 49 U.S.P.Q.2d 1481, 1999 WL 23441, *4 (3d Cir. Jan.21, 1999).

> Any person who, on or in connection with any goods or services, . . ., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (1998). Section 32(1) of the Lanham Act provides in pertinent part:

> Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant. . . .

15 U.S.C. § 1114(1).

2. Thus, the plaintiff must prove that "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir.1994). *See also Ford Motor Co.*, 930 F.2d at 291 (quoting *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir.1990)).

3. The non-profit or non-business character of the parties does not affect the proper trademark analysis. Both parties here are moving goods and services in commerce, and the fact that nothing is bought or sold through the usual public-directed activities of the parties does not controvert the federal trademark legislation's policy of protecting an entity's accumulated goodwill, whether that entity is a business corporation or a non-profit corporation. *See, e.g., Healing the Children, Inc. v. Heal the Children, Inc.*, 786 F.Supp. 1209 (W.D.Pa.1992) (organizations that coordinate medical teams to serve children may create and defend trademarks in spite of their non-commercial characters).

4. The validity and protectability of a mark depend "on a designation's level of inherent distinctiveness." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986). The federal courts di-

vide distinctiveness into a four-category spectrum:

> arbitrary (or fanciful) terms, which bear "no logical or suggestive relation to the actual characteristics of the goods"; *suggestive* terms, which suggest rather than describe the characteristics of the goods; *descriptive* terms, which describe a characteristic or ingredient of the article to which it refers, and *generic* terms, which function as the common descriptive name of a product class.

*Id.* at 296 (emphasis added) (citations omitted). Arbitrary and suggestive terms are inherently distinctive, hence automatically protectable. Descriptive terms are protectable, "but only if [the senior user] proves that consumers identify their term with the claimant, for that identification proves secondary meaning." Generic terms are never protectable. *Id.* at 297.

■ 5. The Gideons' marks are suggestive of the characteristics that The Gideons seek in their members and are, therefore, strong marks. Even if the marks are deemed descriptive, however, they have acquired strong secondary meaning, of which the Court has taken judicial notice and which is conceded by Gideon 300, making them valid and protectable under the Lanham Act and at common law.

6. The biblical story of Gideon appears in the Old Testament Book of Judges, and a common dictionary describes Gideon as "an early Hebrew hero noted for his defeat of the Midianites." Webster's Ninth New Collegiate Dictionary 517 (1983); Pl.'s Mot. for Judicial Notice of Adjudicative Fact.

7. Gideon was a Hebrew grain farmer who gained notoriety for his destruction of an altar of the pagan god Baal. According to Judges, the Lord commanded Gideon to attack the Midianites, an eastern people who had enslaved the Hebrews. When Gideon set out to attack with several thousand men, the Lord culled the army to three hundred by a test. Then the three hundred men, using trumpets, torches, and swords, defeated the Midian army, which numbered over one hundred thousand.

Gideon and his army violently pursued the fleeing Midianites. For this act of leadership, Gideon was offered an hereditary kingship, which he refused. He lived out the remainder of his life quietly, producing seventy-one sons. *See generally* Judges 6–8 (Revised Standard Version).

8. The Gideons is an nondenominational Christian organization (as is Gideon 300) whose activities include distribution of Bibles across the nation and the world, and from a legal, trademark-focused analytical perspective, its members have little or no actual relationship with the biblical character Gideon. They are not farmers, nor are they an army. They do not limit their membership to three hundred. In fact, the only relationship between the two terms is that The Gideons chose their name to honor the historical figure:

> **Gideon** was a man who was willing to **do exactly what God wanted him to do,** irrespective of his own judgment as to the plans or results. Humility, faith, and obedience were his **great elements of character.** This is the standard that the **Gideon association** is trying to establish in all its members, each man to be **ready to do God's will** at any time, at any place, and in any way that the **Holy Spirit** leads.

The Gideons International, Inc., History of the Association (visited February 12, 1999) <http:// gideons.org/history/html> (emphasis in original); Ex. P–3. Apart from the fact that the story of Gideon appears in the Bibles that The Gideons distribute, none of the goods or services provided by The Gideons directly relate to the historical figure.

9. The history and mission of The Gideons demonstrate that GIDEON and GIDEONS are not arbitrary or fanciful marks. Adoption of the historical figure's name was an intentional allusion to his particularly desirable character traits, and lacks the randomness of an arbitrary or fanciful characterization. But the marks are properly classified as suggestive, rather than descriptive. Although the distinction be-

tween suggestive and descriptive marks is not always clear in trademark cases, the history of the marks proves that they suggest, rather than describe, the products and services offered by The Gideons.

10. The Third Circuit uses two tests to parse suggestive and descriptive marks. The first is called the "imagination test," wherein "[a] term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of goods" and "[a] terms is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Canfield*, 808 F.2d at 297 (quoting *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)). *See also Dranoff–Perlstein Ass. v. Sklar*, 967 F.2d 852, 858 (3d Cir.1992) (approving the test's continuing validity).

11. The name "Gideon" does not immediately convey the characteristics of "humility, faith, and obedience." If the name "Gideon" means anything at all-apart from its association with The Gideons—to a lay person, it would mean a great warrior and leader of the Old Testament. To go from the historical figure Gideon to an international, interdenominational Christian organization dedicated to spreading the Word of God, primarily through the distribution of Bibles, one must make a significant leap of imagination. No reasonable fact finder could believe that the association is immediate, obvious, or clear. At most, the employment of the word "Gideon" is symbolic and suggestive of qualities that the Gideons seek in themselves; "Gideon" does not describe the goods and services that they provide. *See, e.g., In re Rexel Inc.*, 223 U.S.P.Q. 830, 831–32 (T.T.A.B.1984) ("GOLIATH" is suggestive when used to mark large pencils, even though the biblical character Goliath is well-known and sometimes used as a common noun; "LITTLE GOLIATH" staplers would infringe on the "GOLIATH" mark).

12. A second test used by the Third Circuit could be termed the "likely to use" test, wherein a court considers " 'whether sellers of similar products [or services] are likely to use, or actually do use, the term in connection with their goods.' " *Dranoff*, 967 F.2d at 858 (quoting *Security Ctr., Ltd. v. First Nat'l Security Ctrs.*, 750 F.2d 1295, 1299 (5th Cir.1985)). Applying this test to the present facts, another organization that sought to spread the Christian faith to others is not at all likely to choose the name or mark GIDEON or GIDEONS. (The Gideons' mission is "To win others for the Lord Jesus Christ through Association, Personal Testimony, and Placing the Bible—God's Holy Word." The Gideons International, Inc., Mission of The Gideons International (visited February 12, 1999) <http://gideons.org/mission.html>, Ex. P–3). There are thousands of other biblical or general references, so there is no likelihood of choosing Gideon. (As to Gideon 300's assertion that the "Gideon 300" name came to Mr. Jenkins in prayer, the inspiration for the name is not relevant (except as to the defendant's intent) as a legal matter, since priority is critical in the acquisition of trademark rights, and Mr. Jenkins' inspiration came 98 years after The Gideons'.)

13. A third test, albeit one that has not been explicitly adopted by the Third Circuit, is the "competitors' need" test. Professor McCarthy describes the test as follows: "[I]s the suggestion made by the mark so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods?" 2 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:68 (4th ed.1998). Obviously, other groups whose mission is to spread the Word of God throughout the world do not need the word "Gideon" to describe what they do.

14. For these reasons, and because the marks GIDEON and GIDEONS do not literally describe the nature, scope, or extent of the products and services provided by The Gideons, they are properly classified as suggestive as a matter of law. *See Dial–A–Mattress Operating Corp. v. Mattress Madness*, 841 F.Supp. 1339, 1347–48

(E.D.N.Y.1994). Since suggestive marks are inherently distinctive, The Gideons' marks are valid and protectable under § 43(a) of the Lanham Act, as this Court noted in its summary judgment ruling. (Docket No. 32, p. 5).

## B. *The Names and Marks GIDEON and GIDEONS are not Descriptive, but if they were, the Marks have Acquired a "Secondary Meaning"*

1. As demonstrated above, GIDEON and GIDEONS are suggestive, not descriptive. Yet even if the marks were found to be descriptive, almost a century of interstate (and international) commercial use have given them a secondary meaning, rendering them distinctive and, thus, valid and protectable under the Lanham Act. As indicated above, the Court has taken judicial notice of such secondary meaning, conceded by Gideon 300.

2. Thus, the subject marks are distinctive, valid, and protectable under the Lanham Act and at common law. *Ford Motor Co.*, 930 F.2d at 291–92.

3. The Gideons' long-standing federal trademark registrations have also attained incontestable status under the Lanham Act, 15 U.S.C. §§ 1058 and 1065, so any attack on them is meritless as a matter of law. *See Ford Motor Co.*, 930 F.2d at 291 (validity, legal Protectability and ownership are proved if the mark is federally registered and incontestable).

4. For registered marks, such as The Gideons' marks, ownership is easily demonstrated by proof of the registration itself. *See* Compl., Exs. A, B; Ex. P–13. The rule is that "the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce." *Ford Motor Co.*, 930 F.2d at 293 (citing *Tally–Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1022–23 (11th Cir.1989) ("actual and continuous use is required to acquire and retain a protectable [sic] interest in a mark")). In this case, the defendant has admitted that it was aware of The Gideons long before it selected the name for its ministry.

5. Even if The Gideon 300 were to dispute this admission of The Gideons' ownership of its marks and The Gideons' priority of use as against the defendant, the evidence overwhelmingly refutes any such contention. The Gideons was founded in 1899 and have used the names and marks GIDEON and GIDEONS in interstate commerce continuously since inception. In the intervening century, The Gideons has provided services and distributed goods, namely Bibles, Scriptures, and other religious literatures, throughout the nation and the world under the names and marks GIDEON and GIDEONS. These facts are uncontroverted, and they establish actual and continuous use of the names and marks over a long period of time. The Gideons undisputedly own the names and marks GIDEON and GIDEONS, as this Court determined in its summary judgment ruling. (Docket No. 32, p. 5).

6. Since ownership by The Gideons of the valid and protectable marks GIDEON and GIDEONS is established, the final element to be proven to establish unfair competition and infringement under the Lanham Act is that the use of the name and mark "Gideon 300" (or "Gideon 300 Ministries") as used by the defendant is likely to confuse the consuming public as to the source of the goods and services provided by that organization.

7. The Gideons have also alleged Pennsylvania common law unfair competition and trademark infringement. The test for common law trademark infringement and unfair competition is essentially the same as the test for infringement and unfair competition under the Lanham Act. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir.1994). *See also Guardian Life Ins. Co. v. American Guardian Life Assur.*, 943 F.Supp. 509, 517 (E.D.Pa.1996) ("The elements of a cause of action for unfair competition under Pennsylvania common law are identical to those under [federal law], with the exception that the goods need not have traveled in interstate com-

merce"). "Federal law, however, serves as persuasive authority because, for many years, it governed those areas almost exclusively and spawned a large body of federal decisions." *Pennsylvania State Univ. v. University Orthopedics, Ltd.*, 706 A.2d 863, 870 (Pa.Super.1998).

8. The Third Circuit has explained that the third element, likelihood of confusion, exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Fisons*, 30 F.3d at 472 (citing *Dranoff–Perlstein Assoc. v. Sklar*, 967 F.2d 852, 862 (3d Cir.1992) (internal quotations omitted)). A plaintiff's showing of proof for the third element depends on whether the products or services offered by the trademark owner and the alleged infringer are in competition. If plaintiff and defendant deal in competing products or services, "the court need rarely look beyond the mark itself." *Id.* at 472 (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983)). For competing products or services, the court focuses on the marks to determine whether they are "confusingly similar." *Id.* at 473 (citing *Country Floors, Inc. v. A Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1063 (3d Cir.1991)). However, where the products or services are not competing, the similarity of the marks is only one of the factors the court must examine to determine the likelihood of confusion.

9. In determining whether the plaintiff's and defendant's products and services are in competition, courts examine whether the products and services can be substituted or interchanged for one another. *See Safeguard Bus. Systems Inc. v. New England Bus. Systems, Inc.*, 696 F.Supp. 1041, 1044 (E.D.Pa.1988). In this case, The Gideons contends that while it distributes and places Bibles in such public institutions as hotels and hospitals, it also places Bibles in rescue missions and is engaged in a variety of other works (recited above) which overlap with the type of Christian outreach work engaged in by Gideon 300. Gideon 300, while claiming that it primarily provides meals to the homeless, also engages in a remarkably broad range of activities (as recited above), typical of outreach activities of Christian ministries.

10. Most significantly, both The Gideons and Gideon 300 seek to introduce the public to the Christian faith through various methods. Although Gideon 300 does not distribute Bibles, it does have a "Read the Bible in a Year" program, and conducts other Christian ministries. In fact, The Gideons is involved with churches and institutions with which Gideon 300 is involved. Accordingly, and primarily due to the fund raising activities of the parties that are critical to their success, the parties deal in competing products or services.

11. In accordance with the analysis prescribed by the Third Circuit in *Lapp*, The Gideons' GIDEON and GIDEONS marks are likely to be confused with the defendant's GIDEON 300 or GIDEON 300 MINISTRIES marks, GIDEON clearly being the predominant—and identical—term in each.

12. Nonetheless, the Court may proceed to analyze the parties' marks as if the parties do not deal in competing goods or services, applying the *Lapp* or *Scott Paper* factors.

13. Where plaintiff and defendant deal in non-competing products or services, the Third Circuit has held that "the court must look beyond the trademark to the nature of the products or services, and to the context in which they are marketed and sold. The closer the relationship between the products or services, and the more similar their sales contexts, the greater the likelihood of confusion." *Lapp*, 721 F.2d at 462.

14. Likelihood of confusion is also the test for actions brought under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), for unfair competition to prevent false representations as to the source or origin of products or services by a mark confusingly similar to one already

in use. *Fisons*, 30 F.3d at 473. *See, e.g., Sun–Fun Products, Inc. v. Suntan Research & Development Inc.*, 656 F.2d 186, 192 (5th Cir.1981) (finding factors relevant to unfair competition claim under 15 U.S.C. § 1125 "essentially the same" as those factors relevant to trademark infringement claim under 15 U.S.C. § 1114). As the United States Supreme Court has commented in an historical context, "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989).

15. The Third Circuit applies a ten factor test to determine likelihood of confusion in cases of trademark infringement and unfair competition involving non-competing products or services. *Fisons*, 30 F.3d at 473 (citing *Dranoff–Perlstein*, 967 F.2d at 862–63; *Ford Motor Co.*, 930 F.2d at 293; *Lapp*, 721 F.2d at 463; *Scott Paper*, 589 F.2d at 1229). These ten factors, known as the *Lapp* factors, or the *Scott Paper* factors, include:

(1) The degree of similarity between the owner's trademark and the alleged infringing mark;

(2) The strength of the owner's mark;

(3) The price of the products or services and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) The length of time defendant has used the mark without evidence of actual confusion arising;

(5) Defendant's intent in adopting the mark;

(6) Evidence of actual confusion;

(7) Whether the products or services, though not competing, are marketed through the same channels of trade and advertised in the same media;

(8) The extent to which targets of the parties' sales efforts are the same;

(9) The relationship of the products or services in the minds of consumers because of the similarity of function; and

(10) Other facts suggesting that the consuming public might expect the prior owner to manufacture a product or provide a service in the defendant's market, or that he is likely to expand into that market. *See Fisons*, 30 F.3d at 473; *Lapp*, 721 F.2d at 463; *Scott Paper*, 589 F.2d at 1229.

16. The Third Circuit has made it clear that the plaintiff does not have to prove actual confusion if the mark is registered and incontestable; "likelihood of confusion is all that need be shown." *Fisons*, 30 F.3d at 472 (citing *Ford Motor Co.*, 930 F.2d at 292 (internal citations omitted)). Where plaintiff's and defendant's products and services are not in direct competition, the court applies the ten *Lapp* factors. *Id.* at 475. In applying the *Lapp* factors, the court must weigh each factor separately; however, not all ten factors must be weighed equally. *Id.* at 476. The Third Circuit has explained that "[t]he weight given to each factor in the overall picture, as well as its weighing for plaintiff or defendant, must be done on an individual fact-specific basis." *Id.* at 476 n. 11. Moreover, the court must treat each trademark infringement case as fact-specific; the court must, therefore, decide a case based on its unique own circumstances. *See Scott Paper*, 589 F.2d at 1231.

17. Confusion is likely and Gideon 300 has infringed The Gideons' trademarks.

18. The name "Gideon 300" (or "Gideon 300 Ministries") is extremely similar to the names and marks "Gideon," "Gideons" and "The Gideons." If a member of the "consuming public" were to hear the phrase "Gideon 300" or "Gideon 300 Ministries," he would immediately associate it with The Gideons, as has already happened, as admitted by Gideon 300. And although composite marks are generally not dissected for comparison with competing marks, "in articulating reasons for reaching a conclusion on the issue of confusion, there is

nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of the mark, provided the ultimate conclusion rests on consideration of the marks in their entireties." *In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed.Cir.1985). In The Gideons' marks, the dominant part of the mark is "Gideon." In the names "Gideon 300" or "Gideon 300 Ministries," the dominant part is also "Gideon," the first word. These dominant parts are identical, thus confusion is inevitable. *See American Plan Corp. v. State Loan & Finance Corp.*, 365 F.2d 635, 639 (3d Cir. 1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 719, 17 L.Ed.2d 548 (1967) ("Where the names are identical ... the names in themselves are evidence of likelihood of confusion").

19. In *Villager, Inc. v. Dial Shoe Co.*, this Court held that

the goods of the respective parties need not be identical nor directly competitive. Infringement is present when the products are sufficiently related so that prospective purchasers would be likely to believe that they emanate from a single source or that they are in some way sponsored by a single source.

256 F.Supp. 694, 702 (E.D.Pa.1966). There is a high degree of similarity between the products or services offered by The Gideons and Gideon 300, as discussed above. When that similarity is coupled with the high degree of similarity between "Gideon" and "Gideon 300" (or "Gideon 300 Ministries"), and that similarity has already confused and will continue to confuse consumers as to product and service separateness, identity, and origin, there is a likelihood of confusion.

20. As demonstrated above, The Gideons' marks are very strong. The marks are included in 47,000,000 Bibles distributed each year (more than 8,000,000 in the United States), more than 816 million Bibles have been distributed by The Gideons (more than 257 million in the United States), and the organization is represented by 130,000 members (more than 80,000

in the United States). Its long and exclusive use of the marks has created an indelible impression in the minds of the consuming public, to the point that common dictionaries define the term "Gideon" by its association with the mark's owner. As discussed above, Gideon 300 has admitted the "well-known" and "strong" nature of The Gideons' marks, and the presence of actual confusion is also demonstrative of such marks' strength. That The Gideons is the subject of wide-and unsolicited-press coverage despite its policy against seeking publicity is further, conclusive evidence of the strength of The Gideons' marks. These marks are undisputedly very strong.

21. In addition, although defendants in trademark cases often attempt to prove third party use to diminish the strength of the plaintiff's mark, in this case Gideon 300 presented no proof of third party use. In fact, Gideon 300 did not even contest The Gideons' Motion in Limine to preclude Gideon 300 from offering its proposed Trial Exhibit D–10, which was a collection of printouts of listings from unidentified sources of persons, organizations and other persons that include in their names the word "Gideon" or a variation thereof. Such Motion in Limine was accordingly granted as uncontested. May 3 Tr., 6:19–22. (Docket No. 36).

22. The fact that The Gideons have taken steps over the years to enforce its marks, including sending cease and desist letters to potential infringers (including other groups using the name "Gideon 300") as a part of a regular and systematic practice (with success until Gideon 300) is also evidence of the strength of The Gideons' marks as accorded by third parties. Vardell Test., May 3 Tr., 150:5–18; Ex. P–12.

23. That The Gideons' marks have attained secondary meaning, as found by this Court as a matter of (unopposed) judicial notice, also favors The Gideons heavily. This is so because in *Lapp*, the Third Circuit has essentially equated secondary meaning, which is a function of or closely

related to the strength of a mark, with likelihood of confusion.

> Likelihood of confusion and secondary meaning are in theory distinct concepts. In practice, however, the evidence required to show either, and the legal consequences flowing from a finding of either, will be virtually indistinguishable. As McCarthy states in his well-known treatise, "secondary meaning and likelihood of buyer confusion, although two separate legal issues, will be difficult to distinguish in viewing the evidence." 1 J.T. McCarthy, Trademarks and Unfair Competition § 15:3 (1973). Secondary meaning exists when consumers seeing a trademark assume that the product it labels came from a particular source. If in fact the product did not come from that source, then there has been buyer confusion. The test we stated in Scott Paper is thus indistinguishable in practice from the more traditionally phrased likelihood of confusion test.

*Lapp*, 721 F.2d at 462. "Though we did draw a formal distinction between likelihood of confusion and secondary meaning in [*Scott Paper* ], proof of one is proof of the other." *Id.* at 465.

24. Both The Gideons and Gideon 300 "sell" their services for free, but both groups support their enterprises with funds raised through charitable donations, including at common churches. Thus, the names and marks they use are very important in identifying them, even more so than if purchases were involved.

25. Gideon 300 has existed as a corporate entity since August 30, 1996. In the intervening period, there have already been several instances of actual confusion concerning a mistaken or possible relationship or affiliation between The Gideons and Gideon 300. This includes not only confusion testified to by the defendant concerning inquiries made by third persons as to whether the defendant is affiliated with The Gideons, but also the confusion encountered by The Gideons' own members upon reading of the incorporation of Gideon 300 in 1996 immediately following such incorporation. Such heavily favors The Gideons in the likelihood of confusion analysis.

26. The defendant's president has admitted that he was aware of the existence of The Gideons and their historical and current use of the mark before adopting the Gideon 300 name. When The Gideons informed the defendant that the mark Gideon 300 was confusingly similar to its own marks, the defendant refused to discontinue its infringing use, *see* Ex. P–16, which conduct amounts to continuing intentional infringing use. Moreover, the statements made by Mr. Jenkins at the June 1997 Promise Keepers rally misrepresenting an affiliation with The Gideons are demonstrative of the defendant's willingness to trade on The Gideons' goodwill and reputation.

27. The evidence of actual confusion in this case is significant and conclusive of a likelihood of confusion, which is, of course, the applicable standard. This evidence includes the defendant's admission that several people have inquired as to an affiliation between the defendant and The Gideons and the actual confusion experienced by two Gideons members, notwithstanding their familiarity with The Gideons.

28. Since actual confusion is potent evidence of the likelihood of confusion, the evidence of actual confusion present here weighs heavily in The Gideons' favor. *See* 3 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:13 (4th ed. 1998) ("Any evidence of actual confusion is strong proof of the fact of a likelihood of confusion.") and cases cited therein. *See also World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971) ("There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion."); *Lone Star Steakhouse & Saloon v. Alpha of Virginia*, 43 F.3d 922, 937 (4th Cir.1995) (active confusion evidence "is entitled to substantial weight as it provides the most compelling evidence of likelihood of confu-

sion"); *Restatement (Third) of Unfair Competition* § 23, comment b (1995) ("[T]he existence of actual confusion is direct evidence that in the market context of their actual use the similarities of the two designations are sufficient to create confusion. . . .").

29. Both The Gideons and Gideon 300 use a traditional community-based approach to conducting their business and distribute literature at their meetings, including in churches. Word of mouth and distribution of literature are their two primary media for "advertising." Both groups conduct meetings for their members and the public, and the fact that their public activities take much the same form in the sense that they both make presentations at (common) churches also favors The Gideons in the likelihood of confusion analysis.

30. Both The Gideons and Gideon 300 seek to introduce the public to the Christian faith through various methods. Although Gideon 300 may not have distributed Bibles to the public (it does, however, have a "Read the Bible in A Year" program), Gideon 300 members have distributed tracts (an activity in which The Gideons also engages), and they have engaged in other methods of attracting the public, including fellowship events, revivals and radio advertising. Neither group focuses its efforts upon one segment of the population; both The Gideons and Gideon 300 seek out the entire world, whether Christian or not, with their goods and services. Their "consumers" are lay people, many of whom may have no ability or experience in discriminating between interdenominational Christian ministries.

31. Mr. Jenkins also admitted that The Gideons is involved with churches and institutions with which Gideon 300 is also involved, which also increases the likelihood of confusion between the parties. Such shared venues for the parties' activities enhances the likelihood of confusion—and may explain the actual confusion.

32. The similarities of purpose and method of outreach between The Gideons and Gideon 300 are very strong. The "consumer" could easily—indeed, unwittingly—relate the goods and services that Gideon 300 provides to The Gideons. That such relation has already occurred, as discussed above, is the best evidence that confusion is likely to continue to occur in the future.

33. This final factor, often unimportant, is very important in this case. The most important similarity between the parties' products and services (apart from their common use of the GIDEON name) is their respective purposes or missions. The mission of The Gideons is "To win others for the Lord Jesus Christ through Association, Personal testimony, and Placing the Bible—God's Holy Word." Ex. P–3. The mission of Gideon 300 is "to unite the body of Christ" and "to reach the world; by feeding the hungry, clothing the naked, & sharing the gospel to those who have not yet experienced the saving power of Jesus Christ." The Gideon 300 Trumpet, vol. 1.2 (Dec.1996), within Trial Ex. P–23. Thus, both groups seek to transcend denominational differences; both groups are nondenominational Christian ministries; neither group is an established church or independent denomination. Their missions are extremely similar, and this similarity has resulted and will continue to result in confusion between them.

34. It is also significant in assessing this factor that the majority of Gideon Bibles (the "product" manufactured by the "prior owner") are printed at National Bible Press in Philadelphia, where there are eight active Gideon camps. Ex. P–1, pp. 101–109. That The Gideons has been established across the nation, and particularly in Philadelphia, for nearly a century is also important in considering this factor.

35. The above analysis demonstrates a strong likelihood of confusion between The Gideons and Gideon 300. The Gideons have demonstrated their ownership of valid, protectable marks and a likelihood of confusion. This proves unfair competition and trademark infringement under the

Lanham Act and under parallel common law, and an injunction is appropriate and necessary to prevent further actual confusion and the continuing likelihood of confusion.

### C. *Dilution of a Famous mark under the Federal Trademark Dilution Act of 1995*

■ 1. The Federal Trademark Dilution Act of 1995 entitles the owner of a famous mark, "subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1) (1998). The Pennsylvania dilution statute contains virtually the same dilution provisions as the Lanham Act. *See* 54 Pa.Cons. Stat. § 1124. The two basic elements of the claim are a famous mark and an act of dilution. The Gideons have proved both.

2. The Court may consider any factors that it deems relevant to determine whether a mark has achieved fame and distinctiveness, but the statute provides a non-exclusive list by way of example. *See* 15 U.S.C. § 1125(c)(1) (1998). The factors are as follows:

- (A) the degree of inherent or acquired distinctiveness of the mark;
- (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
- (C) the duration and extent of advertising and publicity of the mark;
- (D) the geographical extent of the trading area in which the mark is used;
- (E) the channels of trade for the goods or services with which the mark is used;
- (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

- (G) the nature and extent of use of the same or similar marks by third parties; and
- (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1) (1998).

■ 3. Most of the fame and distinctiveness factors are discussed above in the analysis of The Gideons' marks' secondary meaning and the likelihood of confusion resulting from Gideon 300's infringing use. Review and application of these factors demonstrate that The Gideons' marks are famous worldwide and distinctively associated with goods and services provided by The Gideons. The average consumer would and does immediately associate the word "Gideon" with the plaintiff and its work, as perhaps best demonstrated by the fact that the term "Gideon" has become synonymous with The Gideons to the point that dictionaries include separate definitions referring to The Gideons under the word "Gideon." As indicated above, the Court has taken (unopposed) judicial notice of the secondary meaning associated with the terms "Gideon" and "Gideons."

4. Addressing each of the dilution factors in brief, seriatim, following the lettering of the factors set out at 15 U.S.C. § 1125(c)(1):

- A. The degree of inherent or acquired distinctiveness of The Gideons' marks is very high, as evidenced by the testimony at trial and other proof recited above, and Gideon 300 does not contest this;
- B. The duration (almost 100 years) and extent of use (international and even beyond, in outer space) of The Gideons' marks speak for themselves;
- C. The duration and extent of advertising, and especially publicity, which is unsolicited, speaks strongly to the fame and distinctiveness of The Gideons' marks;

D. The geographical extent of the trading area in which The Gideons' marks are used is nearly ubiquitous by virtue of The Gideons' large membership and the volume of their Bible and Scripture distribution activities in hotels virtually everywhere in the United States and their regular annual presence at approximately 75,000 Protestant churches in the United States;

E. The channels of trade for The Gideons' goods and services are widespread by virtue of the public (hotels, hospitals, airlines, physicians' offices, etc.) placement of their Bibles and Scriptures and their presence and involvement with so many churches;

F. The degree of recognition of The Gideons' marks in the trading areas and channels of trade used by The Gideons and Gideon 300 is very high, as acknowledged by Gideon 300;

G. Gideon 300 offered no proof of the nature and extent of use of the name or similar marks by third parties, so this factor, like all the others, favors a finding that GIDEON and GIDEONS are famous marks under the statute; and

H. Finally, The Gideons' mark GIDEON, incorporated in its marks, United States Registration Nos. 631,355 and 677,829, registered on the principal register, also compels a finding that The Gideons' marks are famous marks under the federal and Pennsylvania dilution statutes.

5. Due to the novelty of the federal dilution statute, few courts have considered whether marks are famous. *See* *Jews for Jesus v. Brodsky*, 993 F.Supp. 282, 308, 311 (D.N.J.), *aff'd*, 159 F.3d 1351 (3d Cir.1998) (finding that incontestable mark, "Jews for Jesus," was likely to be diluted by defendant's use of "jewsforjesus.org" as Internet site domain name, applying 15 U.S.C. § 1125(c) and New Jersey dilution statute); *Nailtiques Cosmetic Corp. v. Salon Sciences Corp.*, 41 U.S.P.Q.2d 1995, 1997–98 (S.D.Fla.1997) (NAILTIQUES is a famous mark for fingernail products); *WAWA Inc. v. Haaf*, 40 U.S.P.Q.2d 1629, 1631 (E.D.Pa.1996), *aff'd*, 939 F.2d 1032 (3d Cir.1997) (WAWA is a famous mark for convenience stores); *Intermatic Inc. v. Toeppen*, 947 F.Supp. 1227, 1239 (N.D.Ill.1996) (INTERMATIC is a famous mark for electrical products). However, GIDEON and GIDEONS are, in the view of the Court, much more famous marks than NAILTIQUES, WAWA or INTERMATIC. The Gideons' marks are instantly recognizable to the consuming public. Thus, GIDEON and GIDEONS are famous, distinctive marks.

6. Dilution is defined by statute as a "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127 (1998). Again, much of the analysis of the likelihood of confusion between The Gideons and Gideon 300 applies to lessening of the capacity to identify The Gideons' goods and services.

7. This Court has decided at least one dilution case under the new federal statute, and held that "the injury which the recently enacted legislation sought to redress [i.e., dilution] is an illegitimate undermining of a famous mark by tarnishment, blurring, or parody." *WAWA Inc. v. Haaf*, 40 U.S.P.Q.2d 1629, 1631 (E.D.Pa. 1996). Although the parody aspect of dilution is not at work here, blurring and tarnishment are implicated. As to tarnishment, certain of Gideon 300's activities—especially the solicitation of money donations—have the potential to bring discredit upon The Gideons. This is so because The Gideons and its members do not publicly solicit donations, as the defendant did at the 1997 Promise Keepers rally in Washington, D.C.

8. More importantly, blurring is clearly present here. In *WAWA*, this Court used Judge Sweet's test to determine whether blurring was present. Its six factors are:

(1) Similarity of the marks.

(2) Similarity of the products covered by the marks.

(3) Sophistication of customers.

(4) Predatory intent.

(5) Renown of the senior mark.

(6) Renown of the junior mark.

*WAWA*, 40 U.S.P.Q.2d at 1632 (citing *Mead Data Central, Inc. v. Toyota Motor Sales*, 875 F.2d 1026, 1035 (2d Cir.1989) (Sweet, J., concurring)).

9. As demonstrated and discussed above, the marks "Gideon" and "Gideons" and "Gideon 300" are extremely similar, and the Christian outreach ministries that they represent are also similar in the sense that is significant to the "consumer." The sophistication of the consuming public varies, but, in general, the targets of the parties' respective goods and services are unsophisticated and non-discriminating.

10. Further, that Gideon 300 refused to stop using the Gideon name upon notification that such use was diluting The Gideons' marks and confusing the public is demonstrative of its lack of good faith and a general intent to benefit from the good will and public recognition associated with The Gideons and its marks. The senior mark, that of The Gideons, is well renowned. The junior mark, Gideon 300, is not well-known in general, although it has been featured on one local television news show in Philadelphia, and is presumably gaining notoriety in the community over time. (This is bolstered by successive years of growth in Gideon 300's budget.) "In general, the more unknown the junior mark, the less likely it is to dilute the senior mark," *WAWA*, 40 U.S.P.Q.2d at 1633, so Gideon 300's increasing renown and growth increases the dilutive effect of its name and mark.

11. Balancing these factors, and adding the fact that actual confusion has already occurred in the Philadelphia area, the defendant's use of the name "Gideon" in connection with its name dilutes through blurring the famous marks "Gideon" and "Gideons."

12. To the extent that Gideon 300 raises the defense of noncommercial use of the mark, *see* 15 U.S.C. § 1125(c)(4)(B) (1998), such defense fails as a matter of law, because the not-for-profit nature of the diluter does not equal an absence of commercial activity. *See Jews for Jesus v. Brodsky*, 993 F.Supp. 282, 308 (D.N.J.), *aff'd*, 159 F.3d 1351 (3d Cir.1998) (finding use of "jewsforjesus.org" to be commercial use). By incorporating, raising money, and distributing goods and services to the consuming public, Gideon 300 engages in commercial activity. Gideon 300's use of the United States mail to solicit contributions in interstate commerce is further, strong evidence of the enterprise's commercial character.

13. Furthermore, the purpose of the statute's noncommercial use exception was not to exempt not-for-profit corporations, but to protect " 'parody, satire, editorial and other forms of expression that are not part of a commercial transaction.' " *Dr. Seuss Enterprises v. Penguin Books USA, Inc.*, 924 F.Supp. 1559, 1574 (S.D.Cal.1996) (quoting 141 Cong.Rec. S19310 (daily ed. Dec. 29, 1995) (statement of Sen. Hatch)). The name Gideon 300 is not an expressive use, but rather is a name used to represent the entity in commerce and trade.

14. The above analysis demonstrates that The Gideons is the owner of the famous marks "Gideon" and "Gideons" and that Gideon 300's use of the mark "Gideon 300" has caused dilution of the distinctive quality of The Gideons' mark. This proves dilution under both the Lanham Act and under Pennsylvania law, and an injunction is appropriate and necessary to prevent further dilution.

15. An injunction is also appropriate and necessary to remedy Gideon 300's acts of statutory and common law trademark infringement and unfair competition, which

are established by the finding of a likelihood of confusion discussed above. *See Lapp,* 721 F.2d at 462 ("Once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief.") (citing 15 U.S.C. § 1114(1)).

### III. *INJUNCTION*

1. Accordingly, The Gideons is entitled to the following injunction:

The defendant, Gideon 300 Ministries, Inc., its subsidiaries and affiliates, officers, directors, agents, servants, employees, successors, assigns, and all persons in active concert or participation with them, who receive actual notice of such order by personal service or otherwise, are hereby enjoined by permanent injunction from, in any manner, directly or indirectly:

(1) using as a trade name, trademark or service mark the marks GIDEON or GIDEONS, or any mark or term confusingly similar to, or which constitutes a colorable imitation of, the plaintiff's names and marks GIDEON and GIDEONS;

(2) using the marks GIDEON 300, GIDEON or GIDEONS, or any mark or term confusingly similar to, or which constitutes a colorable imitation of, the plaintiff's names and marks GIDEON and GIDEONS, in connection with the offering, advertising, promoting, marketing or selling of services; and

(3) committing any other act that infringes the plaintiff's names and marks GIDEON and GIDEONS, or otherwise unfairly competing with the plaintiff.

This Court's Final Judgment follows.

### *FINAL JUDGMENT*

AND NOW, this 21st day of July, 1999, as required by Federal Rule of Civil Procedure 52, IT IS HEREBY ORDERED that this Court enter the attached Findings of Fact and Conclusions of Law.

IT IS FURTHER ORDERED that:

1. **JUDGMENT** is entered **IN FAVOR OF** Plaintiff The Gideons International, Inc. and **AGAINST** Defendant Gideon 300 Ministries, Inc.,; and

2. The Defendant, Gideon 300 Ministries, Inc., its subsidiaries and affiliates, officers, directors, agents, servants, employees, successors, assigns, and all persons in active concert or participation with them, who receive actual notice of such order by personal service or otherwise, are hereby **ENJOINED BY PERMANENT INJUNCTION** from, in any manner, directly or indirectly:

(a) using as a trade name, trademark or service mark the marks GIDEON or GIDEONS, or any mark or term confusingly similar to, or which constitutes a colorable imitation of, the plaintiff's names and marks GIDEON and GIDEONS;

(b) using the marks GIDEON 300, GIDEON or GIDEONS, or any mark or term confusingly similar to, or which constitutes a colorable imitation of, the plaintiff's names and marks GIDEON and GIDEONS, in connection with the offering, advertising, promoting, marketing or selling of services; and

(c) committing any other act that infringes the plaintiff's names and marks GIDEON and GIDEONS, or otherwise unfairly competing with the plaintiff.